**Bertmond W. CHARRETTE, Plaintiff,**

v.

**S.M. FLICKINGER, CO., INC., Defendant.**

No. 88–CV–283.

United States District Court, N.D. New York.

Nov. 16, 1992.

O'Hara & O'Connell, Syracuse, N.Y. (Dennis G. O'Hara, of counsel), for plaintiff.

Hodgson Russ Andrews Woods & Goodyear, Buffalo, N.Y. (Ann S. Simet, of counsel), for defendant.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

### INTRODUCTION

Plaintiff, Bertmond W. Charrette, commenced the present action against his former employer, the defendant, S.M. Flickinger Company, Inc. ("Flickinger") on March 17, 1988. Mr. Charrette alleges unlawful termination on the part of Flickinger, in violation of section 4(a) of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a),[1] as well as in violation of section 296(1)(a) of the New York Executive Law.[2] For the past four years, the parties have been conducting discovery and on June 30, 1992, discovery was finally completed. Defendant Flickinger is now moving for summary judgment seeking dismissal of the complaint in its entirety.

---

1. Among other things, the ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; . . . ." 29 U.S.C. § 623(a)(1) (West 1985).

2. In language nearly identical to § 623(a)(1) of the ADEA, New York's Human Rights Law provides, *inter alia,* that:

It shall be an unlawful discriminatory practice:

    (a) For an employer . . ., because of the age, . . ., of any individual, . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y.Exec.Law. § 296(1)(a) (McKinney 1982).

Flickinger asserts that summary judgment is mandated because plaintiff cannot demonstrate, as he must, a *prima facie* case of age discrimination. There are two aspects to this argument. The first is that, at least according to Flickinger, plaintiff Charrette is unable to demonstrate that he was qualified for the position from which he was terminated. Or, more accurately stated, Flickinger believes that Mr. Charrette was not performing his job satisfactorily, and thus he is unable to make out a *prima facie* case of age discrimination.[3]

Second, Flickinger asserts that plaintiff Charrette cannot meet his burden of showing that his termination occurred under circumstances giving rise to an inference of age discrimination. Flickinger contends that Mr. Charrette was terminated because of a long term pattern of poor or substandard performance. And, according to Flickinger, plaintiff Charrette is unable to rebut that legitimate, non-discriminatory reason for discharging him. Basically, plaintiff Charrette responds that there are genuine issues of material fact as to his job performance, thus rendering summary judgment wholly inappropriate.

On October 13, 1992, the court heard oral argument and granted Flickinger's motion for summary judgment. The court will now fully address the parties' respective arguments; but before doing so, a fairly detailed recitation of the facts upon which this motion is based is necessary.

### BACKGROUND

In May, 1983, when he was 57 years old, Mr. Charrette began working for Flickinger as a meat merchandiser. Affidavit of Anne Simet (July 31, 1992), exh. D (interhouse correspondence announcing Mr. Charrette's appointment) thereto. His starting salary was $23,000.00 per year. *Id.*, exh. F (plaintiff's wage history document) thereto. Approximately one year later, in April, 1984, Mr. Charrette received an offer to work for a competitor at a

higher salary. Reply Affidavit of Anne Simet (October 2, 1992), exh. E (Deposition of Bertmond Charrette (March 14, 1991) thereto at 36–37 and 40–41. After informing Dale Conklin, Flickinger's vice president at the time, of that job offer, apparently to entice Charrette to stay with Flickinger, Mr. Charrette was offered a $4,000.00 raise, as well as an offer to pay the closing fees on the sale of his Buffalo home. Mr. Charrette claims that after accepting Flickinger's offer, Mr. Conklin, perhaps "jokingly," told him that "For the amount of money I [defendant] put out," Mr. Charrette should plan on working for Flickinger for a long time. Simet Affidavit, exh. E thereto at 39. Mr. Charrette further claims that Mr. Conklin also told him then that, "You better work for me [Flickinger] for ten years." *Id.*, exh. E thereto at 38–39.

Mr. Charrette received that $4,000.00 raise around April, 1984, at the time of his first performance appraisal, which was done by the merchandising manager, Steve Treat. In the appraisal, Mr. Charrette received a rating of "commendable"—the second highest rating possible. Commendable is defined on the appraisal form as: "Performance exceeds most requirements associated with the job; accomplishment generally above job demands; typically achieved by the best of seasoned incumbents." Affirmation of Dennis O'Hara (September 8, 1992), exh. A thereto at 1. The appraisal did specify, however, in the category of development needs:

> To monitor on an individual basis each salesman's sales & work toward a consitant [sic] contribution from each. Develop additional "work with" days to stimulate sales. Work on improving turns.[4]

*Id.* at 4. The appraisal form also mentioned that plaintiffs's "turns need work, well below budget." *Id.* at 2. Finally, the appraisal recommended "Bert [plaintiff] should concentrate on ride with program

---

**3.** Defendant did not originally articulate the standard in this way; that is in terms of job performance. As will be seen, however, in a discharge case such as this, that is the more

appropriate standard—not whether plaintiff was initially qualified.

**4.** A "turn" apparently refers to the margin of profit.

for sales staff & work with Head Buyer on monitoring individual meat sales." *Id.* at 4.

Even with those constructive criticisms, Mr. Charretté's first appraisal was basically positive; and concluded by stating, in the word's of Mr. Conklin,[5] "Bert has become an extremely valuable asset to the SM Flickinger Co." *Id.* at 4. Not surprisingly, on the appraisal form, Mr. Charrette checked the box indicating that he thought his performance was satisfactory,[6] and he made no comments in the space provided for an employee who disagrees with his or her appraisal. *See id.* at 4.

One year later, in April, 1985, Mr. Charrette was again evaluated; this time by Bruce Briggs, the Head Merchandiser at the time. On this appraisal, Mr. Charrette fell two notches to a rating of "fair"—one ranking above the lowest ranking of marginal. Simet Affidavit, exh. H thereto at 1. A fair performance is defined as, "[m]eeting many but not all basic requirements associated with the job; accomplishment not up to job demands; some improvement is necessary." *Id.* This appraisal, as did the first one, emphasized Mr. Charrette's superior knowledge of the meat industry. Five specific areas of concern were outlined in that appraisal, however, regarding certain aspects of Mr. Charrette's job performance. Those criticisms were aimed primarily at sales goals. Some concern was also expressed regarding deficiencies in the area of "detail work," such as price review and advertising. Specifically, Mr. Briggs testified that plaintiff's "detail work" was "bad." Simet Affidavit, exh. I thereto at 73. As an example, Mr. Briggs mentioned plaintiff's handling of purchase orders, stating that at times plaintiff would order a product without submitting the req-

uisite purchase order to the receiving department. *Id.,* exh. I thereto at 74. The end result would be that delivery trucks would get backed up and, on occasion, they would leave because there were no purchase orders to receive the product when it arrived. *Id.*

Furthermore, Mr. Briggs questioned Mr. Charrette's motivation to the sales force, although he also specifically recognized, "not all to Berts' [sic] doing." *Id.* exh. H thereto at 3. At his deposition, Mr. Briggs explained that the sales force had "totally lost faith in Bert." *Id.,* exh. I thereto at 88. Mr. Charrette's sales were falling below budget and behind the previous year, whereas the rest of the company was growing. *Id.*

At this second performance review, Mr. Charrette's "development needs" were again evaluated and the first element listed in that category was "self control." *Id.* at 4. Mr. Briggs explained at his deposition that Mr. Charrette had a "very short fuse," and that he did not accept criticism in the proper frame of mind. *Id.,* exh. I (Deposition of Bruce Briggs (March 14, 1991)) thereto at 106–107. Along those same lines, Mr. Conklin avers that Mr. Charrette "was repeatedly insubordinate and repeatedly disturbed the operation at Flickinger, and he was advised of this in his 1985 appraisal, when I stated that his failure to improve would result in his discharge." Affidavit of Dale Conklin (October 1, 1992) ("Conklin Reply Affidavit") at ¶ 20. Consistent with those averments by Mr. Conklin, the 1985 appraisal closed by stating, "He [Mr. Charrette] must understand: improve greatly for good career/no improvement will result in termination." Simet Affidavit, exh. H thereto at 4. As he did on the prior appraisal form, Mr. Char-

---

5. Although Mr. Treat, as plaintiff's immediate supervisor, did the bulk of the appraisal, Mr. Conklin also signed off on it and offered his comments, in his capacity as Mr. Treat's superior.

6. The standard, pre-printed appraisal forms used by Flickinger at the time provided a space entitled "Employee's Reaction To Evaluation." *See, e.g.,* Simet Affidavit, exh. G thereto at 4. In that space, employees are asked: "Do you feel

you are performing satisfactorily in this position?" *Id.* Employees are then given the opportunity to check either yes or no in response to that question. *Id.* If an employee responds in the negative to that question, the form provides additional space for the employee to explain that answer. In addition, employees are given space on that form to comment on any disagreements that they might have with their supervisor's evaluation. *Id.*

rette rated his own job performance as satisfactory, and made no comments on his supervisor's evaluation of him. *Id.* Mr. Charrette did acknowledge at his deposition though that he was advised by Mr. Conklin that he could lose his job unless his performance improved. *Id.,* exh. E thereto at 97–98.

Mr. Charrette's explanation for this undeniably poor appraisal focuses on the fact that many of the items about which he was criticized during that appraisal, such as "[t]he issues of profits, policies, procedures, quality of products and self control were not discussed by Mr. Briggs and myself." Affidavit of Bertmond Charrette (September 2, 1992) at ¶ 25; *see also id.* at ¶ 12. In furtherance of that position, Mr. Charrette relies upon selective portions of the depositions of Messrs. Conklin and Briggs wherein they testify, in Charrette's view, about the lack of formal policies, procedures and job description. *See* O'Hara Affirmation at ¶¶ 12 and 13 (and exhibits referenced therein). Mr. Conklin is adamant, however, that even though Mr. Charrette's job expectations might not have been in writing, Mr. Charrette was personally made aware of those expectations on several occasions. *See, e.g.,* Conklin Reply Affidavit at ¶ 15.

In any event, Mr. Charrette further avers that he was "especially upset by the 1985 evaluation because it was totally contrary to what Briggs had communicated verbally throughout the few months he was my supervisor, and because the alleged concerns had not previously been discussed with me or brought to my attention." Charrette Affidavit at ¶ 24. Finally, with respect to the 1985 appraisal, Mr. Conklin explained that he signed it "because Conklin said I had to, not because I agreed with it. In fact, I indicated my disagreement with the evaluation by writing that I felt I was performing satisfactorily in the position." *Id.* at ¶ 26.

In Flickinger's view, Mr. Charrette did not improve his performance in the ensuing months; and thus he was discharged on March 18, 1986—almost one year after his fair performance appraisal. In connection with plaintiff's discharge, a performance appraisal form was again completed by Mr. Briggs. There is conflicting evidence regarding this appraisal form. Mr. Briggs signed and dated the appraisal form on March 17, 1986, one day before Mr. Charrette's termination. Simet Affidavit, exh. K thereto at 4. The front page of that form denotes April 5, 1986, as the review date however. *Id.* at 1. Interestingly, that appraisal was not, as had been the previous ones, signed by Mr. Charrette. In fact, Mr. Charrette avers that he was not even advised of that appraisal until after the commencement of this litigation. Charrette Affidavit at ¶ 27.

For purposes of this motion, the court, as it must, will accept as true Mr. Charrette's averment that he did not see the 1986 appraisal until sometime after the commencement of this litigation. Nonetheless, the 1986 appraisal is not without significance to this motion; the comments thereon mirror many of those in the previous year's appraisal in the areas of sales goals, detail work, and motivation. More important is the fact, however, that the appraiser noted, among other things, "Appraisal is no better than last year's." Simet Affidavit, exh. K thereto at 4.

Mr. Charrette further maintains that not only was he not advised of the "shortcomings" alleged in the 1986 appraisal, but he was not even given an opportunity to address those allegations. Charrette Affidavit at ¶ 27. Indeed, according to Mr. Charrette, he "was consistently advised that the defendant [Flickinger] was fully satisfied with my work performance." *Id.* at ¶ 28. Mr. Charrette also avers that, "Approximately one month before I was terminated, Briggs praised the gross profits I was producing as 'exceptional' in the meat business." *Id.* at ¶ 29. Although not articulated as such, Mr. Conklin clearly believes that Mr. Charrette simply took that comment out of context. Mr. Conklin explains:

I recall that the salesmen [sic] and Mr. Charrette were complimented as a group in regard to increased sales in the prior month, but because the increase in sales was due to everyone's efforts, I would

not have made such a comment in regard to plaintiff specifically. Conklin Reply Affidavit at ¶ 18.

However, Mr. Charrette's assertions that Flickinger was fully satisfied with his job performance stand in stark contrast to the testimony of Mr. Conklin indicating that, on at least two dozen occasions, he talked to Mr. Charrette in an effort to "rehabilitate" him. Conklin Reply Affidavit at ¶ 6 and exh. A thereto (Deposition of Dale Conklin (June 11, 1991)) at 60. In that regard, Mr. Conklin explains that he further attempted to rehabilitate plaintiff at the time of the 1985 appraisal by advising him:

> There is no question of Bert's potential—if applied. He must alter his attitude—goals 180 [degrees] in order to improve his standing with S.M.F. [defendant]. He must understand: improve greatly for good career, no improvement will result in termination.

*Id.* at ¶ 7, and Simet Affidavit, exh. H thereto at 4.

Mr. Conklin further claims that he "personally advised plaintiff on numerous occasions of his performance problems." *Id.* at ¶ 15. He claims to have spoken with Mr. Charrette on "at least three occasions" regarding plaintiff's "problem . . . riding with the salesmen. . . ." *Id.*; exh. A thereto at 52. Further, Mr. Conklin avers that on "at least three occasions" he spoke with Mr. Charrette regarding his "inadequate purchase orders." *Id.*, exh. A thereto at 57. Mr. Conklin mentions that he and Mr. Charrette also discussed "plaintiff's budgeted goals and his performance against those goals. . . ." *Id.*, exh. A thereto at 62. Lastly, with respect to what is referred to as the "ride with" program, Mr. Conklin states that "it was plaintiff's unwillingness to make accommodation and disruptive approach to the ride with program which made him a poor employee." *Id.* at ¶ 16; *see also* exh. A (Conklin deposition testimony detailing plaintiff's difficulties with the "ride with" program) thereto at 53–54.

To support his position that he was terminated due to age, Mr. Charrette points to a number of factors. The first of which is that, in his view, the termination decision was made at the same time he was performing well. Mr. Charrette next relies upon the fact that in 1984, another salesperson, Carl Hughes, was allegedly forced to resign from his position with Flickinger because of age. O'Hara Affirmation, exh. C (Equal Employment Opportunity Commission Affidavit of Carl Hughes) thereto. According to Mr. Hughes, Mr. Conklin suggested that it was time for he (Mr. Hughes) to take it easy, and that he was getting too old to take "gaff" from customers. *Id.* Mr. Conklin then suggested to Mr. Hughes that his territory be divided three ways. Mr. Hughes was under the impression that his territory would be divided for the benefit of new, younger salespersons. *Id.* And according to Mr. Charrette, not only was he replaced by a younger person, but Mr. Hughes was also replaced by a younger person. Charrette Affidavit at ¶¶ 3 and 4.

In addition, Mr. Charrette points to three comments allegedly made by his supervisors. The first is the comment plaintiff attributes to Mr. Briggs that Briggs "hated to see an 'older man' be fired." *Id.* at ¶ 36. The second comment was allegedly made by Mr. Conklin to Steve Treat, Charrette's immediate supervisor. Supposedly, Mr. Conklin said that Mr. Charrette's health should be checked because "he's [plaintiff] getting old." *Id.* at ¶ 37. That comment was purportedly made even though there were no known unique health criteria for the job. Mr. Conklin flatly denies ever making that comment. Conklin Reply Affidavit at ¶ 21. The third comment Mr. Charrette deems significant is that of Mr. Briggs, telling plaintiff that he was discharged because Conklin did not like him. *Id.* at ¶ 35.

The final aspect of Mr. Charrette's age discrimination claim is that, at least in his view, there were other Flickinger employees who were younger than he, with performance problems, who not only were not terminated, but who were also given substantially more time to improve their performance. O'Hara Affirmation at ¶ 33 and exh. L (copies of performance records of other Flickinger employees) thereto.

Primarily based upon the evidence just outlined, Mr. Charrette contends that his allegedly poor job performance was just a pretense for his discharge; and that the true reason for his discharge was his age— 60 years old at the time of termination. By contrast, the above described facts, from Flickinger's vantage point, lead to the inescapable conclusion that Mr. Charrette was not performing his job satisfactorily and so he was justifiably discharged.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

■ Due primarily to a trilogy of cases decided by the Supreme Court in 1986, the standards by which a motion under Federal Rule of Civil Procedure 56 should be judged are well settled.[7] Summary judgment is a drastic remedy,[8] available only when it is clear that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The initial burden of demonstrating the absence of a genuine issue of material fact is on the moving party. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). That burden may be discharged if the movant demonstrates to the court that there is an absence of evidence to support the non-moving party's case, on which that party would have the burden of proof at trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. In deciding whether the moving party has met this burden, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *See Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

■ The burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). That burden is not met where the nonmovant simply shows that there is some "metaphysical doubt as to the material facts." *Matsushita* 475 U.S. at 586, 106 S.Ct. at 1356. As one court has aptly put it, "[s]peculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact." *Greenblatt v. Prescription Plan Services Corp.,* 783 F.Supp. 814, 819–20 (S.D.N.Y.1992) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510). To avoid summary judgment then, enough evidence must favor the non-moving party such that a reasonable jury could return a verdict in its favor. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (interpreting the "genuineness" requirement). Such evidence need not ensure, however, that the jury will return a verdict in favor of the party opposing the summary judgment motion. *See id.* at 257, 106 S.Ct. at 2514 (emphasis added) ("[T]he plaintiff, to survive the defendant's motion, need only present evidence from which a jury *might* return a verdict in his favor.").

An additional consideration in the context of a summary judgment motion in an ADEA case, such as the present one, is that because "employment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence[,]" it is unlikely that there is a " 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent." *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir. 1991) (citations omitted). Thus, as the Second Circuit explained in *Rosen,* "[a] victim of discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evi-

---

7. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

8. *See Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 26 (2d Cir.1988) ("Summary judgment is a drastic procedural weapon because 'its prophylactic function, when exercised, cuts off a party's right to present his case to the jury.'" (quoting *Donnelly v. Guion,* 467 F.2d 290, 291 (2d Cir.1972)).

dence." *Id.* (citations omitted). Thus, in such a case, "where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate." *Id.* (citations omitted).

■ That does not mean, however, that summary judgment is always improper in a discrimination case where intent is at issue. For example, in *Meiri v. Dacon*, 759 F.2d 989 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), the Second Circuit explained, "[t]he summary judgment rule would be rendered sterile, ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* at 998 (citation omitted). Thus after *Meiri*, to survive a defense motion for summary judgment in an age discrimination case, a plaintiff must do more than simply mention intent or state of mind. The plaintiff must come forth with "concrete particulars" substantiating his or her claim of discrimination. *Id.*

As the foregoing makes clear, the court's task on this motion it to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. As will be seen, the result of that inquiry here is that there are no genuine issues of material fact, and thus no need for a trial.

## II. ADEA

■ As previously mentioned, under the ADEA, an employer is prohibited from discharging an employee "because of ... age." 29 U.S.C. § 623(a)(1) (West 1985). It is not unlawful, however, for an employer to discharge an employee based on reasonable factors other than age. 29 U.S.C. § 623(f)(1) (West 1985). In *Promisel v. First American Artificial Flowers*, 943 F.2d 251 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992), the Second Circuit reiterated the analytical framework for examining a wrongful discharge claim under the ADEA.[9] The Court in *Promisel* set forth, once again, the by now familiar test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973):

> [A] plaintiff has the burden of establishing a prima facie case of discrimination. This he can do by showing that [1] he was a member of protected age group, that [2] he was qualified for his position, and that [3] he was discharged [4] under circumstances giving rise to an inference of discrimination. The employer then has the burden of articulating a legitimate, nondiscriminatory reason for its action.... The burden shifts back at that point to the plaintiff to prove that this reason is pretextual.... A plaintiff is not required to show that age was the only determinative factor in the discharge, only that it was a determinative factor, one that made a difference in the employer's decision to terminate the employee.

*Id.* at 259 (citing, *inter alia*, *McDonnell Douglas*, 411 U.S. at 802–05, 93 S.Ct. at 1824–26). Although Flickinger's motion focuses exclusively on plaintiff's ADEA claim, because plaintiff is also seeking recovery under New York's Human Rights Law, it should be noted that the burden-shifting analysis of *McDonnell Douglas* also applies to claims under New York's

---

**9.** Incidentally, the same standards govern ADEA cases as govern cases brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e—2000e–17. *See, e.g., Maresco v. Evans Chemetics*, 964 F.2d 106, 110 (2d Cir. 1992) (citations omitted); *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991); *Russo v. Trifari, Krussman & Fishel, Inc.*, 837 F.2d 40, 43 (2d Cir.1988). That is because "the substantive provisions of the ADEA 'were derived *in haec verba* from Title VII.'" *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180 (2d Cir.1992) (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985)) (quoting in turn *Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978)).

Human Rights Law. *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992) (and cases cited therein); *cf. Tyler*, 958 F.2d at 1180 (citations omitted) ("[N]ew York courts have consistently looked to federal caselaw in expounding the Human Rights Law.").

In another recent case the Second Circuit had occasion to further review, among other things, the nature and scope of the parties' respective burdens of proof in a "pretext" case such as this.[10] Significantly, the plaintiff's burden of establishing a *prima facie* case " 'is not onerous....' " *Tyler*, 958 F.2d at 1180 (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). Plaintiff's burden of establishing a *prima facie* case "need merely be sufficient to shift the burden of production to the defendant." *Greenberg v. Hilton Int'l Co.*, 870 F.2d 926, 934 (2d Cir.1989) (citation omitted) (Title VII action). In fact, the Second Circuit has gone so far as to describe the plaintiff's burden at the *prima facie* stage as *"de minimus."* *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988) (citing *Sweeney v. Research Foundation of the State Univ. of N.Y.*, 711 F.2d 1179, 1184 (2d Cir.1983)). "Once plaintiff establishes his [or her] *prima facie* case, an inference or rebuttable presumption of discrimination is raised that the adverse employment decision, unless otherwise explained, was more likely than not based on impermissible discriminatory factors." *Naphtali v. Reilly*, 777 F.Supp. 1193, 1201 (S.D.N.Y.1991) (citing *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; and *Dister*, 859 F.2d at 1111).

■ Thereafter, the defendant employer has the "burden of production," which is "merely to *articulate* (not *prove* ), via admissible evidence, a legitimate reason for the employment decision." *Tyler*, 958 F.2d at 1180 (citation omitted) (emphasis in original). At this point, however, the employer's burden is not one of proving the absence of a discriminatory motive. *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096 (emphasis added) ("employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus"). The nondiscriminatory reason for—in this case, the termination decision—must be articulated by the employer with "some specificity." *Ibrahim v. New York State Dep't of Health*, 904 F.2d 161, 166 (2d Cir.1990) (citations omitted); *accord Meiri*, 759 F.2d at 997 (employer's explanation must be "clear and specific"). Furthermore, "the evidence produced by the employer should be objective and competent." *Sweeney*, 711 F.2d at 1185. In *Sweeney* the Second Circuit described objective competent evidence as evidence "consist[ing] of the required qualification for the subject position measured against plaintiff's qualifications including background in the relevant field." *Id.* (citation omitted). Importantly, "[s]uch criteria do not became subjective simply because they are evaluated by plaintiff's superiors." *Id.* (citation omitted). Additionally, the court cannot overlook the fact that, "[s]ubjective evaluations are not adequate by themselves because they may mask prohibited prejudice." *Id.* (citation omitted).

■ Then, under *McDonnell Douglas* and its progeny, once the employer has articulated a legitimate, nondiscriminatory reason for the employment decision, the plaintiff has the ultimate burden of proving discrimination and that can be done either directly or indirectly. The plaintiff may either "persuad[e] the trier of fact that a discriminatory reason more likely than not motivated the employer[;]" or the plaintiff may "persuad[e] the trier of fact that the employer's proffered explanation is unworthy of belief." *Tyler*, 958 F.2d at 1181 (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; and *McDonnell Douglas*, 411 U.S.

---

**10.** "Employment discrimination cases ... are frequently said to fall within one of two categories: "pretext" cases and "mixed-motives" cases." *Tyler*, 958 F.2d at 1180 (citing, among others, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 n. 12, 109 S.Ct. 1775, 1789 n. 12, 104 L.Ed.2d 268 (1989)). "In "pretext" cases, the plaintiff must present facts sufficient to remove the most likely *bona fide* reasons for an employment action...." *Id.* (citations omitted).

at 805, 93 S.Ct. at 1825). The Second Circuit has most recently stated that, "the plaintiff must have the opportunity to demonstrate that the employer's proffered reason was not the 'true reason' for the employment decision...." *Id.*[11] The result of this analysis, as one court has explained, is that:

> [i]n the "pretext" stage a merger occurs between plaintiff's ultimate burden and the burden of proving that the defendant's proffered reasons are merely a pretext for discrimination rather than the true reasons for its actions.

*Naphtali,* 777 F.Supp. at 1201–02 (citing *Burdine* 450 U.S. at 256, 101 S.Ct. at 1095). It is against this backdrop that the court will examine the record presently before it on this summary judgment motion.

### A. Prima Facie Case

In this case, there is no dispute as to the first element of plaintiff's ADEA claim. Mr. Charrette was 57 years old when he was first hired by Flickinger, and 60 years old at the time of his termination. Thus, he clearly falls within the protected group under the ADEA, which is persons over the age of 40. 29 U.S.C. § 631(a) (West Supp. 1992). Nor is there any dispute as to the third element—Mr. Charrette was discharged. Moreover, it is uncontroverted that Mr. Charrette was replaced by a man 22 years his junior. The controversy here surrounds the remaining two elements—job performance and inference of discrimination, and it is those two elements which will be the focus of the court's analysis from here on out.

### 1. Job Performance

■ The Supreme Court has held that although the *McDonnell Douglas* test provides a useful yardstick, it "is not necessarily applicable in every respect in differing factual situations." *See Burdine,* 450 U.S. at 254 n. 6, 101 S.Ct. at 1094 n. 6 (quoting *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13). Presumably based upon that flexible approach, when analyz-

ing age discrimination claims in discharge cases, the Second Circuit has modified the second element of the *McDonnell Douglas* test. Instead of focusing on the plaintiff's qualifications, which is the relevant inquiry in the hiring context, the focus is on measuring the employee's qualifications, i.e. job performance. *See Song,* 957 F.2d at 1045 (citations omitted); *Lopez,* 930 F.2d at 161; and *Meiri,* 759 F.2d at 995; *accord Matthews v. Allis–Chalmers,* 769 F.2d 1215, 1217 (7th Cir.1985) (court substituted job performance for qualifications in the discharge context); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014–17 (1st Cir.1979) (same). This job performance component has been defined in terms of whether the employee was doing the job well enough to "'meet[ ] his employer's legitimate expectations.'" *Meiri,* 759 F.2d at 995 (quoting *Huhn v. Koehring Co.,* 718 F.2d 239, 244 (7th Cir.1983)). With respect to an employer's legitimate expectations, the Second Circuit has instructed, "[a]lthough courts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process, ..., they must also allow employees 'to show that the employer's demands were illegitimate or arbitrary,'...." *Id.* (citation omitted) (quoting *Sweeney,* 711 F.2d at 1187 n. 11).

■ As the foregoing demonstrates, the issue of a plaintiff's job performance is interrelated to the employer's job expectations; whether a plaintiff is qualified cannot be determined without also examining the employer's expectations of that individual. Thus, the court will first examine the proof as to Flickinger's job expectations of Mr. Charrette. As in *Meiri,* plaintiff Charrette is challenging the legitimacy of his employer's expectations; and under *Meiri,* ordinarily, he should be allowed to develop that issue at trial. *See also Reich v. New York Hospital,* 513 F.Supp. 854, 860 (S.D.N.Y.1981) (stating that the plaintiff should be allowed to question the legitima-

---

11. *But see Lopez v. Metropolitan Life Ins. Co.,* 930 F.2d 157, 161 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991) (citing *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095)

("It is enough for the plaintiff to show that the articulated reasons were not the true reasons for defendant's action.")

cy of her employer's expectations where she came forth with proof that the employer's demands may have been unrealistic and she had inadequate supervision).

■ The difficulty arises here, however, from the fact that plaintiff Charrette is relying upon inadmissible evidence to show that Flickinger's expectations were illegitimate or arbitrary. Specifically, Charrette avers that a competitor advised him that in the meat industry his "turns" and average gross profits would be considered an "excellent performance." Charrette Affidavit at ¶¶ 31 and 32. There are at least two evidentiary obstacles to the admission of that proof. The first is that it is classic hearsay. The second obstacle is the relevancy of such proof, or, more accurately, the lack thereof. There has been no specific showing by plaintiff that the other food brokerages he called regarding turns were engaged in a business comparable to that of Flickinger. Additionally, there is no proof that the "industry standard" for turns in March or April, 1991 (when plaintiff contacted the other companies) was the same as the industry standard in 1985 and 1986. Indeed, given the fact that generally the national economy has become increasingly sluggish in recent years, it is possible to imagine a scenario where plaintiff's turns in 1985 and 1986, while not up to industry standards then, would have been in 1991 or even now.

■ Obviously, plaintiff Charrette cannot be allowed to avoid summary judgment on the basis that Flickinger's expectations were illegitimate or arbitrary, where that claim is not supported by properly admissible evidence. *See* Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits ..., shall set forth such facts as would be admissible in evidence,...."). Moreover, the documentary proof in the form of plaintiff's 1984 and 1985 appraisals, which he signed, belies the fact, as plaintiff maintains, that Flickinger did not make its expectations known to plaintiff. For example, in 1984, plaintiff was advised that he needed to work on his profit margin ("turns") as they were well below budget. Simet Affidavit, exh. G thereto at 2 and 4. At that time,

plaintiff Charrette was also advised that he needed to "develop additional 'work with' days to stimulate sales." *Id.*, exh. G thereto at 4. More particularly, the appraiser unequivocally stated, "Bert should concentrate on ride with program for sales staff & work with Head Buyer on monitoring individual meat sales." *Id.* Likewise, again in 1985 Mr. Charrette was advised on his appraisal form that he was behind budget goals with respect to margins of profit and profit dollars. *Id.*, exh. H thereto at 2.

Based on the foregoing, due to the lack of any admissible proof by plaintiff as to the unreasonableness of Flickinger's job demands on plaintiff, as well as the admissible documentary evidence outlined as to what was expected of plaintiff, the court concludes that Flickinger's demands of plaintiff were not illegitimate or arbitrary. Thus, the court will now turn to the fundamental issue at this point: was Mr. Charrette qualified? Defendant Flickinger cites two cases, both outside this jurisdiction and both distinguishable, in support of its position that summary judgment should be granted in its favor because plaintiff cannot show that he was qualified. Flickinger first cites to *Botma v. Lenon Bus Service, Inc.,* 699 F.Supp. 194 (E.D.Wis.1988), wherein the district court granted the employer's motion for summary judgment in an ADEA case. *Botma* is not dispositive, however, because unlike the present case, in *Botma*, there was a complete absence of proof by the plaintiff as to whether he was satisfactorily performing his job. *See id.* at 198. The second case cited by Flickinger on this issue, *Huhn*, is also not persuasive. The plaintiff employee's case in *Huhn* was, in the words of the district court, "wholly empty." 718 F.2d at 245.

■ By comparison, a careful review of the record on this motion demonstrates that Mr. Charrette has come forward with at least some proof that he satisfactorily performed his job while employed by Flickinger. First, Mr. Charrette relies upon alleged oral communications by his supervisors, praising his work, and the alleged praise by Mr. Briggs that plaintiff was producing "exceptional" gross profits.

Charrette Affidavit at ¶¶ 28–29. Significantly, Flickinger does not challenge the admissibility of this proof—only its veracity. And, under Fed.R.Evid. 801(d)(2)(D), those statements would be admissible as admissions by a party-opponent. That rule allows the introduction into evidence of a statement by a party's agent "concerning a matter within the scope of the agency . . ., made during the existence of the relationship. . . ." Fed.R.Evid. 801(d)(2)(D). There is no dispute that Mr. Charrette's supervisors were agents of the defendant company. Furthermore, the statements attributed to Mr. Charrette's supervisors as to his job performance plainly concern matters within the scope of the agency of the supervisor. *See Zaken v. Boerer*, 964 F.2d 1319, 1323 (2d Cir.1992) (statement by employer's vice president that employee's predecessor was terminated due to pregnancy concerned matter within scope of agency where offered as party admission against employer's chief executive officer in a pregnancy discrimination action).

■ Second, plaintiff Charrette relies upon his own self-serving statement that, "My performance was excellent including my turns, gross profits, quality levels, and relationships with customers, suppliers, and the sales force." *Id.* at ¶ 14. Clearly that conclusory, self-serving statement, standing alone, would be insufficient to establish that plaintiff performed his job satisfactorily, especially given the well documented evidence to the contrary. *See Thermidor v. Beth Israel Medical Center*, 683 F.Supp. 403, 412–413 (S.D.N.Y.1988) (plaintiff failed to provide evidence sufficient to show that he performed his job satisfactorily where the only evidence proffered was based on his claim that he was never advised of any complaint about his work and where the evidence consisted of mere conclusory allegations).[12] In the present case, however, while plaintiff's proof on the issue of satisfactory job per-

formance is admittedly thin, nonetheless, given the *de minimis* burden of proof to which plaintiff is held at the *prima facie* stage,[13] the court will assume for the sake of argument that plaintiff has met his burden of proof on the element of satisfactory job performance.

### 2. Inference of Age Discrimination

■ Based upon the court's assumption that plaintiff has met his burden of proof with respect to the job performance element, plaintiff is now required to make out a *prima facie* showing that his dismissal was "under circumstances giving rise to an inference of discrimination." *McDonnell Douglas*, 411 U.S. at 802–05, 93 S.Ct. at 1824–26. Flickinger contends that it is impossible for Mr. Charrette to make such a showing because of his uncorrected performance problems, coupled with his age at the time of hiring (57 years old) and the $4,000 raise shortly after the time he was hired. Flickinger also relies upon Mr. Charrette's concession at his deposition that no one at Flickinger ever told him that his termination was, in any way, related to his age. Simet Affidavit, exh. E thereto at 116.

Mr. Charrette responds, in essence, that he believes that the alleged performance deficiencies simply mask the true reason for his termination—age. It is not necessary to delve into the various assertions made by plaintiff Charrette in this regard because there is one obvious factor, completely ignored by plaintiff, which, in combination with the other *McDonnell Douglas* factors, suffices to show circumstances giving rise to an inference of discrimination, and that is the uncontradicted evidence that he was replaced by a significantly younger man. Mr. Charrette's replacement was 38, while Mr. Charrette was 60 at the time of this discharge. Replacement by a younger employee, in connection with

**12.** *Cf. Maresco*, 964 F.2d at 111 (quoting *Williams v. General Motors Corp.*, 656 F.2d 120, 129 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982)) ("'merely because a plaintiff testifies that he was capable of handling one or two or many

salaried jobs other than his own, yet was not relocated to such a job during the reduction, is not enough to show violation of the ADEA.'").

**13.** *Dister*, 859 F.2d at 1114 (citing *Sweeney*, 711 F.2d at 1184).

the other *McDonnell Douglas* criteria, although certainly not the only means by which an inference of discrimination may be shown,[14] allows for an inference of discrimination. *See Haskell v. Kaman Corp.,* 743 F.2d 113, 119 n. 1 (2d Cir.1984)[15] (evidence that plaintiff was sufficiently qualified to continue holding his position, that he was discharged, and that his position thereafter was filled by someone younger than himself or held open for such a person creates a presumption that the employer acted for an impermissible age-related purpose); *see also Littman v. Firestone Tire & Rubber Co.,* 709 F.Supp. 461, 465 (S.D.N.Y.1989) (and cases cited therein).

Some additional evidence which plaintiff believes should have some bearing on the court's analysis at this juncture are the comments mentioned earlier allegedly made by plaintiff's supervisors. In particular, Mr. Conklin allegedly said that plaintiff's health should be checked because " 'he's getting pretty old....'" Charrette Affidavit at ¶ 37. Plaintiff Charrette also relies upon the comment allegedly made by Mr. Briggs that Briggs hated to see an "older man" be fired. *Id.* at ¶ 36. There is also the comment by Briggs that supposedly Mr. Conklin did not like plaintiff, and that was the reason for plaintiff's discharge. *Id.* at ¶ 35.

Addressing those comments in reverse order, the court is hard pressed to see how the fact that Conklin allegedly did not like plaintiff would support an inference of age discrimination. Rather, it appears that perhaps there was simply a personality conflict (a not uncommon situation in any employment setting) between Mr. Conklin and Mr. Charrette. Insofar as the comment about an "older man" being fired is concerned, assuming its admissibility, that evidence in the court's view actually goes to support Flickinger's position and not Mr. Charrette's. That evidence shows that at least someone at Flickinger was sympathetic to Mr. Charrette's circumstances. Moreover, it can certainly be argued that Flickinger actually favors more experienced employees, such as plaintiff, because when he was first hired, he was 57 years old, and several months after that he was given a $4,000.00 raise to entice him to stay with Flickinger, rather than go to a competitor company.

As to the comment about having plaintiff's health checked, the court will assume for purposes of this motion that Mr. Conklin actually made that remark (a fact he vehemently denies). Although that comment may be properly considered in determining whether a plaintiff has made out a *prima facie* case under the *McDonnell Douglas* pretext analysis,[16] in the court's view that comment has little, if any, bearing on the issue of whether an inference of age discrimination may be drawn here. Without knowing the context in which that comment was supposedly made, the court cannot give it much weight. Based upon the present record, there is absolutely no connection between that comment and plaintiff's eventual discharge. Viewed in isolation, that comment (even if made) is innocuous; it is possible that Flickinger wanted plaintiff's health checked for entirely proper reasons, such as for insurance purposes. Thus, no weight can be attached

---

14. *See, e.g., Montana v. First Federal Sav. & Loan,* 869 F.2d 100, 105 (2d Cir.1989) ("in a reduction-in-force case or a structural reorganization case, a discharged employee who seeks under *McDonnell Douglas* to establish a prima facie case, need not show that he was replaced by a younger, newly hired employee; it is sufficient that the discharge occur in circumstances giving rise to an inference of age discrimination.").

15. *But see Vaughn v. Mobil Oil Corp.,* 708 F.Supp. 595, 601 (S.D.N.Y.1989) (" 'Although replacement by someone younger, without more, will not give rise to an inference of age discrimi-

nation, it has been noted that a substantial difference in the ages may be circumstantial evidence that gives rise to that inference.' ") (quoting *Maxfield v. Sinclair International,* 766 F.2d 788, 792 (3d Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986)).

16. *See Kirschner v. Office of the Comptroller of New York,* 973 F.2d 88, 93 (2d Cir.1992) (citation omitted) (" '[S]tray' remarks in the workplace by persons who are not involved in the pertinent decision making process ... may suffice to present a *prima facie* case under the framework set forth in *McDonnell Douglas....*").

to that comment purportedly made by Mr. Conklin.

Nevertheless, from the evidence of replacement by a younger person, taken in conjunction with plaintiff's satisfactory job performance, and his age at the time of discharge, it appears that Mr. Charrette is able to meet his burden on the fourth element of a wrongful discharge claim—an inference of discrimination. Accordingly, viewing the evidence offered by plaintiff cumulatively, and in a light most favorable to him, for purposes of this motion, the court finds that plaintiff Charrette has made out a *prima facie* case of discrimination under the ADEA.

### B. Employer's Rebuttal

■■■ Having determined that Mr. Charrette has met his threshold burden of establishing a *prima facie* case, the court will engage in the next step of the *McDonnell Douglas* analysis: has Flickinger, as the employer, met its burden of production? In particular, the court will consider whether Flickinger can articulate a "legitimate, nondiscriminatory reason" for terminating plaintiff. *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25. As detailed above, Flickinger has undoubtedly met that burden of proof. The evidence overwhelmingly establishes the existence of a nondiscriminatory motive for Mr. Charrette's discharge—his poor job performance. There is ample evidence in the record showing that plaintiff was below targeted sales goals; he was not adequately performing detail work such as advertising and the placing of purchase orders; he lacked self-control; and he was insubordinate.

Flickinger has shown, through well documented performance evaluations and affidavits, as well as the deposition testimony of plaintiff's supervisors, that plaintiff did not perform his job in a manner satisfactory to Flickinger.[17] Additionally, while not pivotal to the court's finding herein, it should be noted that plaintiff has admitted that no one at Flickinger ever told him that age was a factor in the decision to discharge him. Simet Affidavit, exh. E thereto at 116. In short, the court finds that defendant Flickinger has adequately dispelled any inference of discrimination raised by plaintiff in his *prima facie* case.

### C. Pretext

■■■ Because Flickinger has met its burden of production, the burden now shifts back to plaintiff Charrette to demonstrate that the nondiscriminatory reason advanced by Flickinger was but a mere pretext to disguise the true discriminatory basis for the termination. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *Meiri,* 759 F.2d at 997. In a case such as this where the employer does more than merely articulate a neutral reason for the employment decision, and actually substantiates that reason by providing a sound and factually supported basis, "the employee's task of showing that this reason was a pretext will be more difficult.' " *See Halbrook v. Reichhold Chemicals, Inc.,* 766 F.Supp. 1290, 1295 (S.D.N.Y.1991), *aff'd without pub. opinion,* 956 F.2d 1159 (2d Cir.1992) (quoting *Wade v. New York Telephone,* 500 F.Supp. 1170, 1178 (S.D.N.Y.1980) (citing in turn *Lieberman v. Gant,* 630 F.2d 60, 66 (2d Cir.1980)). When an employer raises several nondiscriminatory reasons for discharging an employee, the employee, to defeat a summary judgment motion, must either raise an issue of material fact as to the pretextual nature of the proffered reasons or persuade the court that a discriminatory motive more likely motivated the employer's actions. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. In demonstrating pretext, a plaintiff is not required to show that age was the only factor in the employer's decision. *Montana v. First Federal,* 869 F.2d at 105 (citations omitted). Nor is plaintiff required to show that defendant's "proffered reason is false, but only that its stated reason was not the only reason and that age did make a difference." *Id.* (cita-

---

**17.** That fact is established even without taking into account the 1986 appraisal form, about which plaintiff apparently was not aware until recent years, and which he unquestionably did not sign.

tion omitted). However, if, in the end, plaintiff is "unable to show evidence from which a jury could infer discrimination, ..., then summary judgment may be granted." *Diamantopulos v. Brookside Corp.*, 683 F.Supp. 322, 328 (D.Conn.1988) (citations omitted).

█ That is exactly the position in which plaintiff Charrette now finds himself. The evidence upon which he relies to demonstrate pretext does not convince the court that Flickinger's proffered explanation for termination (plaintiff's poor job performance) is unworthy of credence. *See Meiri*, 759 F.2d at 997 (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095). In other words, Mr. Charrette has simply failed to prove that Flickinger's reason for termination was pretextual.

Not surprisingly, there is no direct proof here of discrimination. Indeed, it is the rare case where such proof is available to a plaintiff. *See Rosen*, 928 F.2d at 533. Even the circumstantial evidence, however, is insufficient to allow Mr. Charrette to overcome Flickinger's showing of a legitimate, nondiscriminatory reason for its decision to discharge him. Mr. Charrette was undeniably replaced by a younger person, and while that could be enough for plaintiff to make out a *prima facie* case, it is insufficient to establish a discriminatory animus. For example, in *Diamantopulos* the court held that the fact that other interviewees were all substantially younger than plaintiff, and that each of them was offered employment, was insufficient, standing alone, to establish a discriminatory motive. 683 F.Supp. at 329. The court reasoned:

> That several younger persons were offered a position while plaintiff was not is merely circumstantial, statistical evidence which alone, though supportive of an inference of discrimination, is an insufficient basis upon which to prove discrimination.

*Id.* (citing *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339–41 n. 20, 97 S.Ct. 1843, 1856–57 n. 20, 52 L.Ed.2d 396 (1977)).

█ The court also does not find persuasive the proof pertaining to the dis-charge of Carl Hughes. First of all, plaintiff is entitled to use statistical evidence to establish a pattern or practice of discharging older employees, from which an inference of age discrimination may be drawn. *Haskell v. Kaman Corp.*, 743 F.2d 113, 119 (2d Cir.1984) (citing *Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 921 (2d Cir. 1981)). As the Supreme Court has stated, however, albeit in a slightly different context (Title VII action), "[c]onsiderations such as small sample size, may of course, detract from the value of such [statistical] evidence, ...." *International Brotherhood of Teamsters*, 431 U.S. at 341 n. 20, 97 S.Ct. at 1856–57 n. 20 (citation omitted). Here, the statistical sample, such as it is, consists of only one person and thus is of practically no significance. The value of this evidence regarding Mr. Hughes is further reduced by the fact that Mr. Hughes left Flickinger in September, 1984—18 months prior to plaintiff's discharge. Thus, given that remoteness in time, it is even more difficult to see how Mr. Hughes' situation has any probative bearing on this case.

Plaintiff also tries to draw support for his position from the timing of the decision to discharge him. Specifically, according to Mr. Charrette, the termination decision was made shortly after April, 1984, when he had just received a rating of commendable on his job performance. In support of that assertion, Mr. Charrette relies upon the deposition testimony of Mr. Conklin. A careful reading of that testimony indicates, however, that what Mr. Conklin actually testified to was that "well over a year and a half before he [plaintiff] was terminated ... we [Briggs and Conklin] knew that we had a problem." O'Hara Affirmation, exh. B thereto (Conklin Deposition) at 59. Mr. Conklin then went on to testify that he and Mr. Briggs "first discussed the salvaging of [plaintiff] because of his product knowledge...." *Id.* Thus, Mr. Charrette mischaracterizes a portion of Conklin's deposition testimony regarding the timing of the termination decision. What Mr. Conklin in fact said at his deposition, and repeats again on this motion, is that the decision to

discharge Mr. Charrette was not made until February or March, 1986—a time well after Mr. Charrette had received only a fair appraisal and when he was purportedly having numerous difficulties on the job. Conklin Reply Affidavit at ¶ 8, and exh. A (Conklin Deposition) thereto at 62–63. Therefore, the court finds the proof regarding the timing of the decision to discharge plaintiff of no consequence.

Finally, although plaintiff's proof with respect to younger employees does give the court pause, after carefully reviewing that evidence, the court is not convinced that it is enough to overcome Flickinger's articulated reason for discharging Mr. Charrette. First of all, this comparative evidence is of little, if any, probative value here in the absence of a proper foundation. There is nothing in the present record showing the manner in which Flickinger management interpreted those various evaluations. Nor is there anything in the record establishing a similarity between plaintiff and those younger employees, in terms of job responsibilities, positions held, supervisors, and geographic location. Thus, under these circumstances, it is impermissible for the court to engage in its own independent interpretation of the appraisals of the younger employees to determine the weight and relative merit to be afforded those appraisals. *See Gibson v. American Broadcasting Companies, Inc.,* 687 F.Supp. 786, 792–93 (S.D.N.Y.1988) (citations omitted). It is equally impermissible for the court to accept plaintiff's conclusions as to the weight and merit to be given to this comparative evidence. *Id.*

Secondly, even if the court could properly review those appraisals, it would have serious reservations about the probative value of that evidence because none of those employees worked at the Syracuse division of Flickinger, where Mr. Charrette worked. Simet Reply Affidavit at ¶ 17.

Furthermore, none of those employees were evaluated by Messrs. Conklin and Briggs—the supervisors who evaluated Mr. Charrette. *Id.* Moreover, the court observes that there is a common theme throughout those appraisals which is missing from Mr. Charrette's appraisals and the other proof offered by Flickinger as to his job performance. That common theme is that in the appraisals of the younger employees there is a pattern of improvement by the employees, which is absent from plaintiff's appraisals. In fact, just the opposite is true of this plaintiff. Not only did plaintiff Charrette not improve between his 1984 and 1985 appraisals, but there was a precipitous deterioration in his job performance. Consequently, this comparative evidence is of little assistance to plaintiff in establishing pretext; and the court finds that plaintiff Charrette has not met his ultimate burden on this motion of proving discrimination.[18]

In conclusion, plaintiff's proffered evidence does not, in the court's opinion, meet the minimal requirement of creating a genuine issue of material fact as to Flickinger's offered reason for discharging plaintiff or as to a discriminatory motive. There is simply nothing in this record creating a genuine issue of fact as to whether Flickinger's articulated reason for discharging plaintiff was unworthy of credence. *See Dister,* 859 F.2d at 1118. In addition, plaintiff's evidence of discriminatory motive is scant. As the foregoing makes clear, lacking from the present record is "solid circumstantial" evidence to prove plaintiff's case. *See Littman,* 709 F.Supp. at 465 (citation omitted). Thus defendant Flickinger's motion for summary judgment must be granted. *See id.*

The motion for summary judgment by the defendant, S.M. Flickinger Company, Inc. is hereby GRANTED; and the Clerk of

---

**18.** As an aside, Flickinger asserts that this comparative evidence should not be given any weight by the court because none of the employees are described as "meat merchandisers" on those appraisals. While that is correct, the court tends to agree with the assertion by plaintiff's counsel at oral argument that it appears that Flickinger may have used the terms "buyer" and "merchandiser" interchangeably; and all of the referenced employees held the position of buyer, in one capacity or another. Therefore, the relevance of this evidence is not affected by the fact that none of the employees therein held the position of meat merchandiser. As discussed above, however, the court does have other concerns about this evidence.

the Court is directed to enter judgment in accordance with this memorandum-decision and order.

IT IS SO ORDERED.