**Paul ROSEN, Plaintiff–Appellant,**

v.

**Richard L. THORNBURGH, as Attorney General of the United States, United States Department of Justice, John Lawn, as Administrator, Drug Enforcement Administration, Carl E. Hinds, as Division Director, New York Division of the Drug Enforcement Administration, Defendants–Appellees.**

No. 448, Docket 90–6133.

United States Court of Appeals, Second Circuit.

Argued Oct. 24, 1990.

Decided March 13, 1991.

Paul Rosen, Brooklyn, N.Y., pro se.

Beverly Kolenberg, Sp. Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty. for the Southern District of New York, Edward T. Ferguson, III, Asst. U.S. Atty., New York City, of counsel), for defendants-appellees.

Before MESKILL and ALTIMARI, Circuit Judges, and METZNER, Senior District Judge.*

ALTIMARI, Circuit Judge:

Plaintiff-appellant Paul Rosen, proceeding *pro se*, appeals from a judgment, en-

tered in the United States District Court for the Southern District of New York (Michael B. Mukasey, *Judge*), granting defendants-appellees' motion for summary judgment. Rosen, who is Jewish, alleges that he was unlawfully dismissed from his position as a Special Agent trainee of the Drug Enforcement Administration ("DEA") in violation of, *inter alia,* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The district court granted summary judgment in favor of the defendants on the ground that Rosen had not established a *prima facie* case of discrimination and, alternatively, that Rosen had failed to rebut the DEA's stated reasons for dismissing him. On this appeal, Rosen contends that the district court failed to consider all of the evidence and to draw permissible inferences in his favor.

For the reasons set forth below, we reverse the judgment of the district court and remand for further proceedings.

## BACKGROUND

On March 23, 1983, Paul Rosen was officially offered a position as a DEA Special Agent, contingent upon the successful completion of a twelve-week training program and a one-year probationary period. At the end of April 1983, the DEA sent Rosen to the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia for training. The FLETC is part of the Department of the Treasury and provides training to various law enforcement personnel. For the most part, Rosen's instructors and counselors at the FLETC were DEA Special Agents. However, FLETC employees provided driving instruction and evaluated the driving portion of the training program. On June 3, 1983, as a consequence of an allegedly poor performance on a driving examination, Rosen was dismissed from the FLETC and terminated as a DEA Special Agent trainee. Rosen subsequently filed a Title VII action in District Court, naming as defendants various Department of Justice and DEA officials and

---

* The Honorable Charles M. Metzner, United States District Court for the Southern District of

New York, sitting by designation.

alleging that the defendants had discriminated against him on the basis of his religion.

### A. Defendants' Motion for Summary Judgment

After a period of discovery, the defendants moved for summary judgment. *See* Fed.R.Civ.P. 56(b). In support of their motion, the defendants relied predominately upon the deposition testimony and affidavits of FLETC instructor Billie Everett and DEA Special Agent Patricia McCurdy, as well as various DEA internal memoranda. According to the defendants, the evidence demonstrated that on May 14, 1983, Rosen participated in a practical driving session. The session consisted of five different driving exercises and required the trainees to drive around a track at high speeds while executing a series of turns. According to Everett, Rosen's performance was marred by several driving errors, most notably a near collision with another car. As a result, the DEA officials responsible for the FLETC training camp decided that Rosen needed remedial driving instruction and that he would be forbidden from driving a government vehicle until he demonstrated adequate driving skills.

On June 2, Rosen was told to report for remedial training the following day. According to Billie Everett, Rosen's remedial driving instructor, the June 3 remedial driving session consisted of two hours of demonstrations and specific instructions on proper driving techniques. Everett then evaluated Rosen's driving skills, based on a two lap test, and concluded that he failed to meet the DEA's driving standards. Consequently, Everett informed the DEA officials that Rosen lacked basic driving skills and that further remedial training would be of no value. Based on Everett's recommendation, the DEA officials decided that Rosen was unable to satisfy DEA training requirements and dismissed him from the program. Less than one week later, the DEA officially terminated Rosen's employment.

The defendants also noted that since April 1983, nine individuals, including Rosen, have been deemed to have failed the vehicle driving portion of the training program. Three of these nine subsequently satisfied the driving requirement; the remaining six were dismissed, in whole or in part, because of their lack of driving proficiency.

Based on the foregoing, the defendants argued that Rosen was not qualified to be a DEA Special Agent and, therefore, could not establish a *prima facie* case of employment discrimination. Further, the defendants asserted that Rosen's failure to pass the driving test was a legitimate, nondiscriminatory reason to dismiss him.

### B. Rosen's Opposition to Summary Judgment

Rosen opposed the defendants' motion for summary judgment, arguing that there existed genuine issues of material fact to be tried. Specifically, Rosen disputed the defendants' claim that his dismissal was predicated solely upon his failure to demonstrate adequate driving skills. In essence, Rosen asserted that he was capable of satisfying the DEA driving requirement and that the test he failed was improperly administered by DEA and FLETC staff members who were motivated by anti-Jewish animus.

To support his allegations, Rosen provided a detailed affidavit setting forth his version of the relevant events. According to Rosen, upon arrival at the FLETC, Robert Drew Moren, the DEA class coordinator, welcomed the new trainees by advising them that the DEA had been "stabbed in the back by Congress, the Courts and other commie pinko fags who were out to destroy this organization." Shortly thereafter, DEA Counselor Patricia McCurdy derisively asked Rosen what kind of name "Rosen" is, and stated that she did not like the name and would henceforth call him "Franklin." During one class, Rosen claims that an instructor questioned him about whether he enjoyed lox and bagels and repeatedly referred to New York as "Rosenland." In another class, apparently as part of a lecture on the cultural diversity that a Special Agent must be prepared to encounter, the

instructor explained that Jews only care about their money. Another instructor made derogatory remarks about the Jewish population in Miami, Florida.

Rosen also asserts that his counselors and instructors condoned the anti-semitic behavior of his DEA classmates. In particular, one trainee called Rosen a "half-breed jew bastard" and made other religious slurs. Although the staff was aware of this trainee's expressed anti-semitism, Rosen was paired with this individual for various practical training sessions.

Over the Memorial Day Weekend, after approximately six weeks at the FLETC, Rosen was permitted to visit his home in New York. While in New York, Rosen consulted with an attorney about his experiences during DEA training. When he returned to the FLETC, based upon the lawyer's advice, Rosen informed his DEA counselors that he wished to file a formal discrimination complaint. The counselors advised Rosen against taking any action or publicly discussing his complaints. Nonetheless, Rosen insisted that his claims of discrimination be addressed. Consequently, on June 1, 1983, Robert Drew Moren met with Rosen to discuss his grievances. According to Rosen, Moren became extremely annoyed after Rosen described his numerous encounters with anti-semitism at the FLETC. Moren insisted that any problems encountered within the DEA must be resolved internally and that Rosen should not discuss his complaint with anyone outside the DEA.

On June 2, the day after Rosen's acrimonious meeting with Moren, Rosen was told to report for remedial driving instruction on June 3. Rosen concedes that he had previously heard rumors from fellow trainees that he had not adequately performed in the practical driving session conducted on May 14. Indeed, Rosen acknowledges that his performance was marred by a near collision with another car, which was driven by FLETC instructor Billie Everett. Rosen contends, however, that the mishap was Everett's fault. Rosen also claims that, following the near accident, Everett decided to ride in his car and provide him with specific driving instructions. These instructions, however, were virtually incomprehensible and caused Rosen to drive erratically. Despite the foregoing, it was not until June 2 that Rosen was informed that his driving skills were deficient, and that they potentially imperiled his status as a DEA Special Agent. Moreover, throughout this period, Rosen was permitted to drive government vehicles.

On June 3, at 6:00 a.m., Rosen reported to the driving course and discovered that Billie Everett would be his instructor. According to Rosen, the remedial instruction consisted of Everett driving through the course once while explaining his technique to Rosen, who was in the passenger seat. After completing the lap and providing some additional tips, Everett exited the car and directed Rosen to drive through the course. As Rosen drove, Everett (apparently communicating via two-way radio) gave him a few directions concerning the proper speed to maintain; Everett did not provide any other significant instructions or criticism. Once Rosen completed a single lap, he was directed to exit the course. As he did so, Rosen observed that a group of six people—including Everett, Moren and a DEA counselor—were waiting by the track. After a brief conversation with Everett and Moren, Rosen was told to return to his scheduled class.

A few hours later, Rosen was removed from class and led by two DEA counselors to the office of George Ellin, Chief of the Academic Operations Unit. Ellin informed Rosen that he was being dismissed from the FLETC because he had been unable to satisfy the DEA's driving requirement. Later that day, Rosen was ordered to pack his belongings, was escorted to the airport, was directed to report to the DEA office in New York and was placed on an airplane. Within one week of his re-assignment to New York, Rosen was terminated from his position as a DEA Special Agent.

Furthermore, Rosen maintained that, at the time of his difficulties at the FLETC, he had been a licenced driver for ten years and had an unblemished driving record. In fact, prior to being hired by the DEA,

Rosen was employed in the Absconder Search Unit of the New York State Division of Parole, where he participated without incident in numerous high speed chases. An affidavit of a former partner attests to Rosen's exceptional driving proficiency.

Rosen also attacked the defendants' documentary evidence. In particular, he stressed that virtually every internal DEA memorandum mentioning his driving deficiencies was dated June 3—the date of his dismissal. The sole exception was a handwritten memorandum, dated May 15, from Patricia McCurdy to Robert Drew Moren which discussed Rosen's poor showing during the May 14 practical driving session. Rosen also challenged the defendants' assertion that five other trainees had been dismissed from the FLETC due to unsatisfactory performance in the driving portion of the training program. Citing to documents obtained through discovery, Rosen claimed that he was the only DEA Special Agent trainee to have been dismissed solely as a result of inadequate driving skills.

### C. The District Court's Opinion

After reviewing the evidence submitted by the parties, the district court determined that driving proficiency was a reasonable employment qualification, which Rosen had failed to satisfy. The court also noted that Billie Everett was responsible for Rosen's dismissal, yet Rosen had not established that Billie Everett was actually aware that Rosen was Jewish. In sum, the court reasoned that Rosen was not qualified to be a DEA Special Agent and, thus, could not establish a *prima facie* case of discrimination. Similarly, the court concluded that Rosen could not establish that the reason given for his dismissal was pretextual.

### DISCUSSION

On this appeal, Rosen contends that the district court erred in holding that he failed to adduce sufficient evidence on the issue of his qualification to serve as a DEA Special Agent. Although Rosen concedes that driving proficiency was a legitimate employment requirement, he nevertheless claims that the court below failed to fully comprehend the nature of his complaint, *i.e.*, that he was denied any meaningful opportunity to satisfy the DEA's driving requirement as a consequence of religious discrimination. We agree.

### A. Proof in a Title VII Action and Summary Judgment

■ In actions brought under Title VII, the plaintiff bears the burden of initially proving a *prima facie* case. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). To establish a *prima facie* case, the plaintiff must show that he or she: (1) was a member of a protected class; (2) was qualified for the position; (3) was discharged; and (4) the discharge occurred in circumstances giving rise to an inference of discrimination. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). The burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's [discharge]." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Once the defendant advances evidence of a nondiscriminatory basis for its action, the burden again shifts to the plaintiff, who ultimately must establish by a preponderance of the evidence that the nondiscriminatory reasons advanced for plaintiff's rejection are a pretext for discrimination. *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.

A court may grant summary judgment only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Where, as here, the nonmovant bears the ultimate burden to prove at trial that the defendant discriminated, [ ]he may defeat the summary judgment motion by producing sufficient

specific facts to establish that there is a genuine issue of material fact for trial." *Montana v. First Fed.Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989) (citations omitted). Further, in ruling on a summary judgment motion, "the court must resolve all ambiguities and draw all reasonable inferences in favor of [the non-moving party]." *Patrick v. LeFevre,* 745 F.2d 153, 158 (2d Cir.1984); *accord Donahue v. Windsor Locks Bd. of Fire Commissioners,* 834 F.2d 54, 57 (2d Cir.1987).

■ Also relevant to this inquiry is our recognition that employment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence. An employer who discriminates is unlikely to leave a "smoking gun," such as a notation in an employee's personnel file, attesting to a discriminatory intent. *Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85 (2d Cir.1990); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1112 (2d Cir.1988). A victim of discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence. *See Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464–65 (2d Cir.1989); *Hollander,* 895 F.2d at 85; *cf. United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716–17, 103 S.Ct. 1478, 1482–83, 75 L.Ed.2d 403 (1983). Consequently, in a Title VII action, where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate. *See Meiri,* 759 F.2d at 998; *Sweat v. Miller Brewing Co.,* 708 F.2d 655, 657 (11th Cir.1983).

### B. *The Existence of Triable Issues of Fact*

■ The defendants' argument in support of summary judgment is predicated on the undisputed fact that Rosen received a failing grade on his driving test. Because Rosen failed the driving test, the defendants claim that he was not qualified to serve as a DEA Special Agent and, therefore, cannot establish a *prima facie* case of employment discrimination. *See, e.g., Ma-*

*son v. Pierce,* 774 F.2d 825, 828–29 (7th Cir.1985); *Trotter v. Todd,* 719 F.2d 346, 347–48 (10th Cir.1983). The district court agreed with this analysis, assuming that Rosen had disputed neither the legitimacy of the driving requirement nor his failing grade on the test. Accordingly, the court held that no material issues of fact existed for trial.

The court's analysis, however, misconstrued the nature of Rosen's claims and failed to properly consider whether a triable issue of fact had been presented. In actuality, Rosen's contention is that his driving skills were never properly evaluated and that he was not afforded a fair opportunity to satisfy the DEA's driving proficiency requirement. Thus, the legitimacy of the driving requirement and the fact that Rosen was given a failing grade on the driving test were not disputed. Rather, the central question was whether anti-Jewish animus affected the driving requirement as applied to Rosen. In other words, was Rosen properly tested to determine the adequacy of his driving skills and, if so, was he provided with the same opportunity to satisfy the driving requirement as other Special Agent trainees who initially failed the test?

The defendants claim that Rosen was given two chances to demonstrate the adequacy of his driving skills and that he failed in both instances. Despite this claim, Rosen has specifically alleged that, during the March 14 practical driving session, he was almost driven off the track by Billie Everett. Moreover, Rosen contends that Everett then entered his car and provided driving instructions with which compliance was impossible. According to Rosen, it was this interference that caused his difficulties. With respect to the June 3 driving test, Rosen asserts that Everett merely directed him to drive once around the course; after Rosen completed the lap he was excused. In effect, Rosen believes that the test was a sham.

A variety of circumstantial evidence supports Rosen's assertion that the defendants' evaluation of his driving skills was, at most, a perfunctory exercise. Although the defendants contend that on March 14

they realized that Rosen was an unusually poor driver, it was not until June 2—one day after Rosen demanded that action be taken in response to his complaints about anti-semitism—that he was informed that he needed remedial driving instruction. Similarly, while the defendants claim that as a result of the May 14 driving session Rosen was prohibited from driving government vehicles, Rosen indicates that he was never informed of this alleged prohibition and, consequently, continued to drive government vehicles throughout his stay at the FLETC.

Additionally, an affidavit submitted by Rosen's former New York State Absconder Search Unit partner attests to Rosen's competence as a driver. Although this affidavit is by no means dispositive of the issue of Rosen's ability to satisfy the DEA's driving requirement, it certainly raises doubts about the defendants' finding that Rosen "needs to attend a course in driver education from AAA or any driving school for beginning drivers." Further, various documents produced by the defendants suggest that Rosen was the first Special Agent trainee ever dismissed solely as a consequence of poor driving skills. Those documents also indicate that other trainees who initially failed to satisfy the driving requirement were provided with substantially more remedial assistance than was afforded Rosen.

We also find unavailing the defendants' contention that Rosen cannot survive summary judgment because Everett did not know he was Jewish. We believe that a trier of fact might reasonably conclude that Rosen's religion was apparent from his surname as well as from the vocal anti-semitism engendered by his presence at the FLETC. There were also numerous occasions for McCurdy or Moren or some other DEA staff member to mention to Everett that Rosen was Jewish and had complained about anti-semitism. In fact, on June 3, both McCurdy and Moren were present and spoke with Everett while Rosen was taking his driving test. Furthermore, even if Everett was unaware of Rosen's religion, he was not the sole individual responsible for Rosen's dismissal. Indeed, the record provides ample evidence that a variety of DEA and FLETC staff members played a role in the ultimate decision.

To summarize, a factual dispute exists regarding whether Rosen was qualified for the position he sought. Since the defendants do not dispute that Rosen has satisfied the remaining conditions for establishing a *prima facie* case of employment discrimination, we believe that Rosen has produced sufficient evidence to survive the defendants' motion for summary judgment.

Of course, we intimate no view as to the ultimate outcome of this case. After a plenary trial—at which the credibility of witnesses can be assessed and the competing evidence can be weighed—the finder of fact will be in a better position to determine whether the defendants did or did not discriminate. However, at the summary judgment stage of these proceedings, the court's determination that there was no religious discrimination as a matter of law was improper.

## CONCLUSION

In light of the foregoing, the judgment of the district court, granting the defendants' motion for summary judgment and dismissing plaintiff-appellant's complaint, is reversed and the case is remanded to the district court for further proceedings.