**Jeanette ROSA, Plaintiff,**

v.

**NATIONAL WESTMINSTER BANK, Defendant.**

**CV 90–3095 (ADS).**

United States District Court, E.D. New York.

Feb. 2, 1994.

Rosen, Leff, Hempstead, NY (Robert M. Rosen, and Jeffrey S. Harwin, of counsel), for plaintiff.

Epstein, Becker & Green, P.C., New York City (Philip I. Weis, and Kenneth J. Kelly, of counsel), for defendant.

## MEMORANDUM AND ORDER

SPATT, District Judge.

The issues in this case concern a charge of discrimination in the setting of the consumer credit division of a major bank. The plaintiff, a collection representative at the defendant National Westminster Bank, contends that she was denied promotion because she is an Hispanic female.

### *Background*

This action alleging employment discrimination, was brought claiming violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*). In a document entitled "Amendment to Complaint" dated October 16, 1991, the plaintiff apparently added a cause of action pursuant to 42 U.S.C. § 1983. It appears that the Section 1983 cause of action was not pursued, and this bench trial is solely based on the Title VII cause of action.

The plaintiff Jeanette Rosa ("the plaintiff" or "Ms. Rosa") was first employed by the defendant National Westminster Bank ("the defendant" or "the Bank") as a credit card production clerk in 1978 at a salary of $7500 per year and received yearly raises to approximately $11,000. In November 1983 she became a collection representative trainee in the Bank's Consumer Credit Division ("the Department"). She had no prior credit or collection experience. During 1983 and 1984, the plaintiff was the recipient of commendations, including three awards and three monetary grants. The standard job progression within this department was (1) collection rep-

resentative trainee, then (2) "collection representative" and then (3) "senior collection representative."

On November 5, 1984, the plaintiff was promoted from trainee to collection representative. On June 24, 1987, the plaintiff was placed on a ninety-day probationary period for alleged insubordination, followed by a second probationary period effective May 3, 1988. At the expiration of this probationary period in August 1988, she commenced a disability leave of absence in connection with a pregnancy. On April 17, 1989, after giving birth and while still out on disability leave, the plaintiff commenced an eight week parental leave. The plaintiff then requested an extended long-term leave of absence. She was then granted a one-year parental leave of absence to expire on August 18, 1989. A request by the plaintiff for a further extension was denied. She was advised to return to work on August 18, 1989. The plaintiff did not return to her employment with the bank on that date and she was terminated.

## THE TRIAL—FINDINGS OF FACT

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) (see also Colonial Exchange Ltd. Partnership v. Continental Casualty, 923 F.2d 257 [2d Cir.1991]).

During this discussion, the Court will make findings of fact which will be supplemented by additional findings later in the opinion.

A collection representative in the Consumer Credit Division of the Bank, involving Visa credit cards, attempts to collect delinquent accounts mostly by way of the telephone and also by mail. When the customers mail in the payment, the collector gets credit for "moving the balance" (Tr. at p. 15).[1] There are delinquent accounts that range from 30–day accounts to 180–day accounts. The same procedures are used to collect all the delinquent accounts.

At the Bank, employees are evaluated in a document called a "Non–Exempt Performance Appraisal Form." It is the Bank's policy to review each employee's perfor-

mance on a yearly basis. The first such appraisal for the plaintiff as a collection representative trainee was dated October 16, 1984 (Plf's Exh. 2). The report gave the plaintiff generally good ratings as to work proficiency. For example:

"Jeanette has shown steady progress in developing her knowledge of the Visa product and the various collection laws. In addition, she has shown a good ability to apply this knowledge towards the development of her collection technique.

.    .    .    .    .

Jeanette offers a high level of cooperation and responds positively to organization needs."

However, even in 1983 and 1984, at the beginning of her credit collection career as a trainee, there was a problem with Ms. Rosa's punctuality and absences, as noted in the October 1984 appraisal form:

"Occasionally late. Attendance needs some improvement. Explanation 3 incidents, 6 days out. Jeanette needs to improve on her punctuality."

On the other hand, as stated above, the plaintiff's work performance was good. According to her former manager PETER ROMPF, who left the Bank in 1984, her collection ability was outstanding. Rompf also testified that some people were promoted from trainee to senior collector in less than three years. In fact, it only took Rompf one year to move up from trainee to senior collector. Of course, Rompf had prior credit collection experience.

In support of her claim of discrimination, the plaintiff points to the promotion of other employees from collection representative to senior collector in less than three years. Two such persons were Jack Chieffo and Daniel Mazza. In this regard, the Court notes that the job description for senior collection representative (Plf's Exh. 5) includes the statement that the job "requires minimum of three years collection experience." Mr. Rompf testified, however, that he did not require an employee to wait for that three year period. In fact, he testified that based

---

1. Trial transcript pages are denoted as "Tr. at p." Exhibits admitted into evidence during the trial are denoted as "Plf's Exh. ——" or "Dft's Exh. ——."

on what he had seen of the plaintiff's performance evaluations when he was at the bank in 1983, he definitely would have promoted the plaintiff to senior collector. However, it is clear that Mr. Rompf had little personal knowledge of the plaintiff's performance (see Tr. at p. 57).

During the plaintiff's tenure as a collection representative she was, as of March 4, 1985, one of the most effective collectors (see Plf's Exh. 11) and on May 6, 1985, was given congratulations for excellent results (see Plf's Exh. 12).

The Court notes that during the plaintiff's employment at the Bank, she received a National West Policy Manual (Plf's Exh. 8), which included the following admonition with regard to attendance and punctuality:

**"Attendance And Punctuality**

You are part of a team which works together to service our customers and conduct our business. It is important for you to be at your job on time. Tardiness affects the quality of customer service and places a burden on your fellow workers.

If you are going to be late or absent, it is essential that you notify your supervisor by phone within a half hour of your starting time. You will not be paid for absences from work during your first three months of employment.

Your supervisor may require a doctor's note if, due to illness, you are out of work for three days or more. In addition, if you are out ill for an extended period of time, you should notify your supervisor of your progress at least once a week."

In addition, when Ms. Rosa commenced her employment as a collector trainee she received a copy of the "Consumer Credit Division—Policy Manual" (Plf's Exh. 9), which included the following directions on business hours and attendance:

"BUSINESS HOURS Fair debt collection laws regulating our industry provide for collection calls between the hours of 8:00 a.m. and 9:00 p.m. Our work day commences at 8:30 a.m. with our full-time staff working until 5:00 p.m. and part-time staff working from 5:00 until 9:00 p.m.

ATTENDANCE POLICY This is a Division Policy which is based on the last twelve months attendance:

0–3 incidents—acceptable

4 incidents—oral warning

5 incidents—first written warning

6 incidents—second written warning

7 incidents—probation

In the event you are ill and unable to report for work, or you will be late, please call (516) 531–7174 between 8:15 a.m. and 9:00 a.m. and speak to the department manager or secretary."

In her September 27, 1985 appraisal evaluation (Plf's Exh. 13), the plaintiff was given a very favorable work performance. However, as to attendance and punctuality, it was indicated that she received a written warning within the prior twelve months and, as an explanation, it was stated:

"5 incidents, 7 days out. Received oral warning with regard to punctuality."

In addition, in a draft that the plaintiff herself filled out in the category entitled "overall rating," Ms. Rosa checked the box labelled "consistently meets expectation" rather than two more favorable ratings, namely, "exceeds expectations" and "clearly outstanding."

In a third performance evaluation form dated October 11, 1985 (Plf's Exh. 4), the plaintiff again scored well in performance. It was noted that she was "very helpful in assisting her co-workers with Spanish speaking customers." However, the same problem with punctuality appeared in that it was noted that she "received oral warning with regard to punctuality."

In her fourth performance evaluation form dated October 8, 1986 (Plf's Exh. 6), the plaintiff was given excellent ratings by EDWARD LEWANDO, her immediate supervisor. It was stated that: "Jeanette has a very clear understanding of her job skills and ability to resolve problems independently"; "Jeanette put 100% into each and every account no matter what size of balance. She is able to resolve problems independently"; and "Jeanette is a very independent worker and requires very little supervision. Her

accounts and desk are organized to perfection." In particular Mr. Lewando's comments were that "During the last six months that Jeanette has been with my unit, she has worked hard towards striving for her goals. She is very well organized and work habits are good."

Ms. Rosa sent a memorandum to Mr. Lewando with regard to the October 8, 1986 evaluation (Plf's Exh. 6). In this memorandum dated October 15, 1986 (Plf's Exh. 15), she stated, "I have looked over my employee evaluation. As for the most part of the profile, I totally disagree." After detailing her reasons for the disagreement, she stated that "I feel cheated and unrecognized and not given the acknowledgement I feel I deserve.... My goal is to attain Senior Collector position. That has been my goal since I started here, which I feel I should have been given the title by now due to my previous explanation in Part IV (Comments). According to my present supervisor's comments, 'she has worked hard towards striving for her goals.' So what happened? Why wasn't I rewarded?"

The Court notes that these critical observations were made by Ms. Rosa approximately two years after she was promoted to collection representative. The Court further notes that in her candid memorandum bitterly complaining about her treatment, Ms. Rosa never said a word about being discriminated against as a female or an Hispanic.

On the face of this memorandum, LAWRENCE HAY, a Bank Vice–President and the plaintiff's department head, wrote in his handwriting:

"Discussed concerns of this memo with Jeanette. I explained to her how she can achieve senior collector and she agreed to attempt to enhance her performance for such consideration."

In a crucial part of her testimony, the plaintiff stated that Supervisor Hay discussed her October 1986 memorandum (Plf's Exh. 15) with her, as follows:

"Q Now, Jeanette, after your interoffice memo, did you sit down and discuss with anybody why you weren't promoted to senior collector?

A Yes.

Q Who did you discuss it with?

A Larry Hay.

Q And what was the discussion?

A He went over the interoffice memorandum, Exhibit 15 and he told me it was bank policy that they couldn't give me the promotion right now, but he could in six months.

Q What was the bank policy?

A On what he said, I guess it was they couldn't give you another review for another six months.

Q Go ahead.

A And then he told me, this time we are not going to look for a reason to give it to you. We are going to look for a reason not to."

Curiously, the plaintiff testified that after her initial interview in 1983, until October 1986, she never discussed a promotion to senior collection representative with any supervisor.

The plaintiff testified that her October 15, 1986 memorandum angered the department's hierarchy and things worsened for her. For example, she stated she was then accused of making personal phone calls. The plaintiff essentially claims that as a result of her complaints in her October 15, 1986 memorandum, there was retaliation against her. However, there is unrefuted documentary evidence that prior to her October 15, 1986 memorandum, in 1984 and 1985, the plaintiff was warned orally and in writing about her lateness problem. Also prior to this memorandum, Mr. Lewando talked to her about her personal telephone calls. The plaintiff admitted making non-lengthy personal phone calls.

In her next annual evaluation form dated October 9, 1987 (Plf's Exh. 16), her performance, although still satisfactory, apparently declined. In the category "Key Job Responsibilities," she received three "4" ratings and four "5" ratings. Four meant "somewhat less than satisfactory," and five was defined as "unacceptable." Significantly, the plaintiff conceded these figures were correct but explained that all 180–day collectors were doing badly. It was stated on the evaluation form

that "Jeanette must be able to show more consistency when it comes to her work." As to the category entitled "Internal Relations," number five was checked indicating that she "shows little cooperation or teamwork. Not responsive to organization needs." The explanation for this critique was that "Over the past year Jeanette has shown little concern about organizational needs. The only time Jeanette has shown any cooperation was during her period of probation."

Further, in the self-management category it was stated: "As evident in Jeanette's productivity, when Jeanette wanted to do well she did and when she was negative towards the bank, she just did not care (lateness continues to be excessive)." This mixed evaluation report also stated that "Jeanette has always been willing to lend a hand when work flow has been at its peak."

As in all of her evaluations from the inception of her work in the department, the plaintiff had a problem with punctuality in that she received a written warning within the twelve months prior to October 9, 1987 for "excessive lateness." Her overall rating was "somewhat less than satisfactory." Her supervisor's comments were as follows:

"During the past year Jeanette's overall performance has deteriorated. Her work habits, attitude and punctuality need immediate improvement. I will continue to offer whatever assistance Jeanette requires."

Ms. Rosa responded in writing on this evaluation form, as follows:

"My goals continued to be the same (attain senior collector). I am still displeased with the manner I am being reviewed. I seem to be a victim of circumstances and definitely not understood. Explanation furnished on request."

While the plaintiff contends that the reports after October of 1986 were in the nature of retaliation, the record does not support this claim. She was given a $1,000 raise at or about that time. For a long period prior to any such complaint by the plaintiff, she clearly had punctuality and attendance problems. According to her personnel records (Plf's Exh. 18), during the last three months of 1983 she was late three times. In 1984 she was late twenty-one times. On December 7, 1984, she was given an oral warning and was told "one more incident and a written warning will go into her file." Several such written warnings as to her persistent tardiness did go into her file.

Another problem for the plaintiff involved her "side business." When first employed by the Bank she sold clothing, perfume and jewelry, at the Bank. These sales were made during breaks, lunch hours and after work. Ms. Rosa testified that the Bank knew that she was in this side business. Besides, she stated, "other employees also did side selling." In fact, Supervisor Lewando's wife sold ornaments and "Ed Lewando would bring them in and sell them in the office."

Vice President Hay described the plaintiff's selling activities as follows:

"Q  And in order for her to achieve senior collector, she had to stop being rarely late or absent?

A  No.  She had to start spending more time at her desk, stop making personal phone calls, and stop walking into other areas of the division, taking people in those areas away from their work.

Q  And did you think that if she was— withdrawn.

Where did you get all this information that she was doing that?

A  The trips—well, first of all, Mr. Rosen, she frequently walked around with a large, I guess you call it a pillow case or something along those lines, with stuff in there she was selling.  I would get calls from other divisions of the bank asking me to please get Jeanette removed.

The security department of the bank would frequently call me and tell me she was creating an obstacle in the lunchroom, in the restrooms and so on.  It was a constant conversation with Jeanette on this subject.

Q  It was very disruptive to your lunch staff?

A  If she wasn't there, yes.  Because other people had to take her calls, and all her

incoming calls had to be fielded by other people.

It was disrupted—disruptive to my staff, and God help me if the other 89 people decided they would be selling, I would be in the soup" (Tr. at pp. 450–451).

The Court notes that even after Ms. Rosa received a disciplinary memorandum with regard to her personal selling activities, she testified that she declined to stop these activities:

"Q  Did you respond in any fashion to that mention of your selling activities in the disciplinary memorandum?

A  No.

Q  Did you change any of your selling activities, decrease them?

A  No.

Q  Why not?

A  I was doing it on my own time.

Q  Had your supervisors by that point in time, 1987, advised you that your selling activities were interfering with your work?

A  But they weren't.

Q  Did your supervisors tell you that they were?

A  In the memorandum, yes.

Q  And did they ask you to desist from the activity?

A  Yes.

Q  And did you desist from the activity in 1987?

A  No" (Tr. pp. 275–276).

Further, the plaintiff's salary was increased steadily during her tenure in the Credit Collection Department. As a collection representative trainee she earned $11,700 and was increased steadily to a base salary of $16,000 in October 1987. The Court notes that the plaintiff received an $1100 raise, representing a 7.7% increase, on November 3, 1986, two weeks after the supervisors received her rebuttal memorandum of October 15, 1986. She also received a $600 raise on October 5, 1987.

LAWRENCE W. HAY is the Vice President and Department Head of Loss Control, including the Credit Card Collection Division. He testified that he established one specific requirement for the position of senior collec-

tion representative, namely, that it "requires minimum of three years collection experience" (see Plf's Exh. 5). Some of the attributes he looks for in such a promotion was the ability to assist the supervisor and to accept responsibility.

In his conversations with the plaintiff in October, 1986, Mr. Hay told her he would consider her for promotion "if she got her act together." According to Hay not only did the plaintiff not "clean up her act" but her tardiness became worse. While she showed improvement in several categories, including personal phone calls, her tardiness and unauthorized absences continued unabated. Hay testified that Ms. Rosa was not promoted due to her overall performance including the tardiness, unauthorized absences, and her side business. The Court credits this testimony.

The plaintiff further testified that after her conversations with Mr. Hay, both Hay and Lewando picked on her about her personal phone calls. Also, in conclusory terms, the plaintiff complained that comments were made of her "Spanish speaking" by co-employees and supervisors. In addition, she testified that in her presence Lewando called an unnamed absent fellow employee "a black bitch."

Further, Ms. Rosa testified that there were only two Hispanic females in the one hundred employees in the "Open End Collection" Department and none attained the rank of senior collector. In addition, Ms. Rosa testified that there were no Hispanic supervisors in her department; only five female supervisors; and only one part-time black supervisor. However, the evidence revealed that another Hispanic employee named Nancy Heredia received a recommendation from Mr. Lewando based on her outstanding performance as a collector.

In 1987, the plaintiff received a series of memoranda regarding her punctuality. On May 19, 1987 Lewando sent her a memorandum (Plf's Exh. 19) indicating that she was "late" or "left" on thirteen occasions between November 17, 1986 and May 19, 1987. Included in these late occurrences were three occasions in which she "overslept." She was advised that "If this attendance record con-

tinues, it may be necessary to place you on probation, an action which we would prefer to avoid if you can." None of these facts were refuted by the plaintiff.

At this time, not only was her punctuality and attendance at issue, but, apparently her work was suffering. In addition, the subject of her lack of cooperation was also raised. On June 22, 1987, Jack Chieffo, her immediate supervisor, sent her a memorandum (Plf's Exh. 20) which stated, among other things, the following:

"UNSATISFACTORY PERFORMANCE

On May 19, 1987, you were placed on written warning regarding your poor attendance record.

In addition to this written warning, on several occasions your supervisor had to speak with you and point out other areas which have been below job expectations. These areas are as follows:

*Productivity:*

During a nine (9) month period from September 1986 to May 1987, you have managed to meet your monthly minimum 'Effective Percentage' goal on only three (3) occasions (effective percentage being defined as the percentage of delinquency resolved within an assigned control). The actual results for this period are listed below:

. . . .

*Self–Management:*

—Excessive Personal Calls—On several occasions you were advised to limit your personal calls and concentrate on business related affairs.

—Soliciting—Any selling of merchandise that interferes with your daily work as well as other bank personnel must be eliminated.

*Internal Relations:*

Needs improvement in level of cooperation and responsiveness.

Your demonstration on Friday, June 19, 1987, in refusing to complete a work assignment when asked by your supervisor and myself was insubordinate. This action was disruptive to your fellow employees and the overall work flow within the unit.

If within the next ninety (90) days any aspect of your job performance mentioned in this memorandum fails to improve or any reoccurrences takes place, it will be cause for your immediate termination."

In a discussion concerning this memorandum, Ms. Rosa testified that Mr. Hay "told me that there is only one of you and there is all of us" (Tr. at p. 135). At that point Chieffo and Lewando changed her work assignments from 180–day account collections to 60/90 day collections, as follows:

"Q When you say demoted, what do you mean by that?

A I was doing 180 days at that point. And they came to me and they said, well, we are going to put you to 60/90 days now. *And on top of the demotion, to add insult to injury, they still expected me to attend executive charge off meetings for the 180–day accounts.*

Q *And what happened?*

A *And I said no.*

Q And what did you do? Tell me what you did. Did you just say no or did you do something else?

A Yes. I gave the file to the representative that was handling the account now and I told them that I wasn't going to do it, I am doing my job now, which is the 60–90 accounts they had given me.

THE COURT: *You wouldn't do it, meaning you wouldn't' attend these meetings, executive meetings?*

THE WITNESS: *Right, I wouldn't attend"* (Tr. at pp. 135, 136) (emphasis supplied).

By a document entitled "Probation Memorandum" dated June 14, 1987 (Plf's Exh. 21), the plaintiff was placed on probation, as follows:

"Your demonstration on Friday, June 19, 1987, in refusing to complete a work assignment when asked by your supervisor and myself was insubordinate. This action was disruptive to your fellow employees and the overall work flow within the unit.

For the next ninety day period you are being placed on probation. Any further refusal to follow your supervisor's proper

work related directives will be cause for your immediate termination."

According to the records of the Bank, introduced by the plaintiff, the management of her department continued to be critical of her performance, tardiness and personal phone calls (see Plf's Exhs. 22, 23 and 24). The plaintiff implies that this was merely an incorrect paper trail by the Bank to avoid promoting her to senior collector because she was a female Hispanic. The Court disagrees. The record is replete with specific incidents of continued tardiness, personal phone calls and refusal to cooperate with management. All of this evidence is essentially unrefuted.

On January 21, 1988, Mr. Hay sent Ms. Rosa a memorandum (Plf's Exh. 24) which stated that her work "compares to less than 50% of the volume of each of the other collectors handling 60–90 day delinquency." In addition, her "work queue at the end of business day January 14, 1988 was five days behind." The following facts were set forth in the memorandum:

*"SELF–MANAGEMENT*

Your frequent tardiness, time spent away from your workstation and numerous lengthy personal telephone calls can no longer be tolerated. At my request, your supervisor, Ed Lewando, monitored your activities during the day on Wednesday, January 13. You arrived thirteen (13) minutes late for work. You frequently left your desk for periods averaging ten (10) minutes and placed at least four (4) personal telephone calls which added up to one (1) hour eighteen (18) minutes. On two (2) of these calls, your supervisor requested you to hang up and return to work. This lack of attention to your duties demonstrates that you have little concern for your responsibility to this organization.

*ATTITUDE*

On June 24, 1987, you refused to perform an assignment given to you by your supervisor. You were placed on 90 days probation for insubordination but refused to sign the written memorandum. Following this incident, your manager, Jack Chieffo, reviewed with you your job responsibilities but you again refused to sign an acknowledgement that this review took place.

On October 9, 1987, you were rated less than satisfactory during your annual performance review. Required corrective action was noted in your work habits, attitude and punctuality, with your supervisor's assistance offered as needed.

You have consistently demonstrated a lack of effort in your work, an indifference to management, little concern for organizational needs and a very poor record of self-management.

I will continue to monitor this activity over the next ninety (90) days and unless consistent improvement is noted, you may be placed on probation."

The Court again notes that all of this evidence of tardiness, personal phone calls, side personal business and failure to cooperate is virtually undisputed. The plaintiff explains all of these negative qualities by generalizations such as the Bank was picking on her, the data was "incorrect" and everyone else in the department was acting similarly.

The plaintiff pointed to five co-employees in her department who, she says, in or around 1986 were promoted to senior collector within three years. These persons included three white females and two white males; Eileen Taft, Michelle Rinaldi, Debra Nunes, Robert Foggia and Anthony Maresco. According to the plaintiff, the collection records of these five co-employees "were not any better than mine."

However, on cross-examination it was conceded by Ms. Rosa that it took Eileen Taft and Michelle Rinaldi at least four years to be promoted to senior collector. Also, Ms. Rosa stated that it was possible that Robert Foggia and Anthony Maresco had substantial prior collection experience. In addition, another female named Tina Goodson was similarly promoted in four years; Linda Hart, a black female took five years to get to senior collector; Martin Lang made it in nine years; and Jeanette Deal took seven years, as did Jim Kennedy.

Interestingly, Eileen Taft also had a problem with attendance and punctuality. However, unlike the plaintiff's reaction, after Chi-

effo spoke to her, Ms. Taft improved dramatically and was promoted to senior collector in about five years.

The plaintiff's attendance problem continued unabated. During the period between July 6, 1987 and March 4, 1988, she took two personal days and five unscheduled vacation days (see Plf's Exh. 26). The plaintiff initialed these entries, apparently authenticating these facts. On one occasion, March 28, 1988, she did not come to work and did not phone in. When a Bank employee called her home, she was told that "Jeanette was on her way to work." At 9:43 a.m., Mr. Lewando received a "call from Jeanette's boyfriend, John, advising me that Jeanette would not be in work today due to a death in the family" (see Plf's Exh. 27). She apparently stayed out for some time because on March 30, 1988 she was sent a telegram requesting that she "report to work or contact directly either Jack Chieffo or Steve Warren (531–7630) before April 1, 1988 at 5:00 p.m. or we will consider that you are no longer interested in returning to Nat West" (Plf's Exh. 27).

On April 6, 1988, Mr. Hay sent the plaintiff another memorandum (Plf's Exh. 29) covering the period May 1987 to April 1988, in which he detailed sixteen late days, fifteen absent days and six unscheduled vacation days. Although the plaintiff testified that she could not find any other documents to substantiate the information contained in these memoranda, she never refuted any of these late days, absences or unscheduled vacation days.

Despite the warning in the April 6, 1988 memorandum with regard to her tardiness, the plaintiff continued to be late for work. During April 1988, she was late four additional days, and was again placed on probation (see Plf's Exh. 30).

In May 1988, the plaintiff became pregnant again. She was under the normal stress involved in collection work and, in addition, was suffering from fainting spells and blackouts. Her doctor told her to stay home. She then took a maternity disability leave. She was entitled to and took ten weeks with full pay and then remained on long term disability leave for six months from October 1988 to April 1989. Her fourth child was born on March 1, 1989. The plaintiff then asked the Bank to extend the leave of absence on several occasions. The Bank did extend her leave of absence from April 1989 to June 12, 1989 (see Plf's Exh. 31) and then from June 12, 1989 to August 18, 1989. On June 20, 1989, the plaintiff wrote to Mr. Hay requesting "a long term leave of absence" based on parental hardship because of her four children (Plf's Exh. 35). In her letter, she stated that "at this time I can't even say for sure when I can return to work." On July 7, 1989, Mr. Hay wrote to the plaintiff (Plf's Exh. 36) approving her leave of absence only to August 18, 1989. She was told that "If you do not return to work, your employment with National Westminster Bank USA will be terminated effective August 18, 1989." The plaintiff requested an additional three weeks after August 18, 1989, which request was declined. Her employment with the Bank was terminated when she did not report to work on August 18, 1989.

In March 1990, Ms. Rosa obtained employment with Marine Midland Bank as a collector at a salary of $20,000 per year. After six weeks she obtained a better position at Chase Manhattan Bank as a senior collector at a starting salary of $21,000. She is still employed at Chase Manhattan at a salary of $23,000 plus commission, family medical and dental coverage and is part of a pension and profit sharing plan.

The plaintiff filed a discrimination claim against the Bank with the New York State Division of Human Rights. Notwithstanding the filing of the complaint, the plaintiff was granted the extensions of her leave of absence to August 18, 1989 and she concedes that no one at the Bank made any comment to her regarding her complaint (Tr. at pp. 320–321). The State Division of Human Rights made a determination of "no probable cause."

## DISCUSSION

### The Standards in a Title VII Case

"Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), makes it an unfair employment practice for an employer to dis-

criminate against any individual with respect to ... the terms and condition of employment because of such individual's race, color, religion, sex, or national origin; or to limit, segregate or classify his employees in ways that would adversely effect any employee because of the employee's race, color, religion, sex, or national origin." (*Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 645, 109 S.Ct. 2115, 2118, 104 L.Ed.2d 733 [1989]; *Bridgeport Guardians, Inc. v. City of Bridgeport,* 933 F.2d 1140 [2d Cir.1991]).

As the Supreme Court observed in *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), "[t]he objective of Congress in the enactment of Title VII ... was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees."

■ In this action, the plaintiff alleged a "disparate treatment" Title VII claim. (*See* Complaint, ¶ 20) A claim of disparate treatment, by reason of failure to promote, is actionable under Title VII. (*See Sousa v. Hunter,* 739 F.Supp. 756, 759 [E.D.N.Y.1990] [citing *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 [1988]).

■ Disparate treatment "is established under Title VII by proof that plaintiff was treated less favorably than others solely because of [his] race, color, religion, sex or national origin." (*Zahorik v. Cornell University,* 729 F.2d 85, 91 [2d Cir.1984]). To establish a discriminatory treatment claim under Title VII, proof of discriminatory motive is "critical". Discriminatory motive can be proved by direct or circumstantial evidence, though most often a Title VII plaintiff "is usually constrained to rely on the cumulative weight of circumstantial evidence" (*Rosen v. Thornburgh,* 928 F.2d 528, 533 [2d Cir.1991]).

■ A Title VII claim, including one alleging discriminatory treatment, is tried by a three-step process (*see Woodbury v. New York City Transit Authority,* 832 F.2d 764, 769 [2d Cir.1987]). The Second Circuit re-

viewed the mechanics of a Title VII trial as follows:

"The Supreme Court fashioned the manner in which a Title VII action is presented by establishing the now familiar pattern of shifting burdens of proof. Complainant has the initial burden of proving a *prima facie* case of discrimination, the burden then shifts to the employer to articulate a legitimate nondiscriminatory reason for its action and, finally complainant must show that the employer's stated reason was pretextual. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04 [93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668] (1973). Once the employer satisfies its burden of production, the inquiry moves to 'a new level of specificity,' where the plaintiff has the burden of persuading the court 'that the proffered reason was not the true reason for the employment decision.' *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255–56 [101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207] (1981). The plaintiff may carry this burden 'directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' *Id.* at 256 [101 S.Ct. at 1095]." (*Ibrahim v. New York State Dept. of Health,* 904 F.2d 161, 165–66 [2d Cir. 1990]).

■ However, even if the trier of fact rejects the defendant's submission that its reasons were justified, the burden of proving that the motivation for the failure to promote the plaintiff was improper remains with the plaintiff. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) ("[T]he Court of Appeals' holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff ... ignores our repeated admonition that the Title VII plaintiff at all times bears the 'ultimate burden of persuasion.'") (emphasis in original).

In *Hicks,* the United States Supreme Court eliminated the uncertainty that had developed as a result of certain lower court decisions as to the plaintiff's burden of proof in a Title VII action after the plaintiff had

established "pretext." (*See Id.* at p. ——, 113 S.Ct. at p. 2750). In so doing, the Court confirmed that a plaintiff cannot merely establish that the employer's "proffered reason was not the true reason for the [challenged] employment decisions" and, without more, expect to prevail. (*Id.* at p. ——, 113 S.Ct. at p. 2748 *quoting, Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 [1981]). The *Hicks* Court went on to state:

> "We have no authority to impose liability upon an employer for alleged discriminatory employment practices unless an appropriate factfinder determines, according to proper procedures, that the employer has unlawfully discriminated. We may, according to traditional practice, establish certain modes and orders of proof, including an initial rebuttable presumption of the sort we described earlier in this opinion, which we believe *McDonnell Douglas* represents. But nothing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable." (*Id.,* —— U.S. at p. ——, 113 S.Ct. at p. 2751).

In fact, in deciding a motion in this case, this Court stated:

> "Since there is ... no direct evidence of discrimination this case has to be tried as a Title VII case, ... it is going to come down to whether I believe that it [defendant's reliance on plaintiff's poor record of attendance and punctuality as grounds to deny her promotion] is pretextual...."

Thus, even if the Bank's reasons are found to be pretextual, the plaintiff must, nevertheless, prove that she was not promoted as a result of intentional discrimination or retaliation. "It is not enough ... to disbelieve the employer: the factfinder *must* believe the plaintiff's explanation of intentional discrimination." (*Hicks,* —— U.S. at p. ——, 113 S.Ct. at p. 2254).

■ Employing the three-part Title VII test, the plaintiff must first establish a *prima facie* case by proving the following factors: (1) she is a member of a protected class; (2) she was qualified for the position for which she sought promotion; (3) despite her qualifications, she was not promoted; and (4) others were promoted with similar or lesser qualification (*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 [1973]; *Lopez v. Metropolitan Life Insurance Co.,* 930 F.2d 157, 161 [2d Cir.1991]; *Rosen v. Thornburgh, supra,* 928 F.2d at p. 532).

While these factors are not necessarily applicable "in every respect to different factual situations" (*McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at p. 802 n. 13, 93 S.Ct. at p. 1824 n. 13), they "promote the general principle that a Title VII plaintiff must carry the initial burden of offering evidence adequate to raise [ ] an inference of discrimination" (*Meiri v. Dacon,* 759 F.2d 989, 996 [2d Cir.1985] [quoting *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 [1978]], *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 [1985]). (*Accord Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 [1977]).

Once the plaintiff establishes a *prima facie* case, the defendant must "produce" "some" legitimate, non-discriminatory reason for its action—in the instant case, for its failure to promote. (*See Rosen v. Thornburgh, supra,* 928 F.2d at p. 532; *Ibrahim v. New York State Dept. of Health, supra,* 904 F.2d at p. 166).

■ Finally, under the third step of the analysis, the plaintiff must satisfy his ultimate burden, by a fair preponderance of the credible evidence (*see Villanueva v. Wellesley College,* 930 F.2d 124, 129 [1st Cir.1991]; *Rosen v. Thornburgh, supra,* 928 F.2d at p. 532; *Sweeney v. Research Foundation of the State University of New York,* 711 F.2d 1179, 1187 [2d Cir.1983]), that the defendant's stated reason(s) for their actions was pretextual and that the failure to promote the plaintiff was due to discrimination against her as a Hispanic female. (*Cf. Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 [2d Cir.1991] [quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253,

101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 [1981]] ["'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff'"]) (*see also St. Mary's Honor Center v. Hicks, supra*).

### The Standards in a Title VII Retaliation Case

■ The Second Circuit has repeatedly held that the distribution and allocation of burden of proof in retaliatory discrimination claims "follow the general disparate treatment analysis set forth in *McDonnell Douglas,* and *Texas Department of Community Affairs* cases. As stated above, this test must be refined by the holding in *Hicks.* (*See Cosgrove v. Sears Roebuck & Co.,* 9 F.3d 1033 [2d Cir.1993]; *Lambert v. Genesee Hospital,* 10 F.3d 46 [2d Cir.1993]; *Taitt v. Chemical Bank,* 849 F.2d 775, 777 [2d Cir. 1988]). The rule, as stated by the Second Circuit in *Cosgrove,* is as follows:

"This Court has previously held that the distribution and allocation of burdens of proof in retaliatory discharge claims follow the general disparate treatment analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05 [93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668] (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–56 [101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207] (1981). *See Sumner* [*v. U.S. Postal Serv.*], 899 F.2d [203] at 208 [ (2nd Cir.1990) ]. The plaintiff must make a *prima facie* showing of discrimination by a preponderance of the evidence. *Id.* This test has been further refined by the Supreme Court's holding in *St. Mary's Honor Ctr. v. Hicks* [—— U.S. ——], 113 S.Ct. 2742 [125 L.Ed.2d 407] (1993), which, pursuant to *Harper v. Virginia Dep't of Taxation* [—— U.S. ——, ——], 113 S.Ct. 2510, 2517 [125 L.Ed.2d 74] (1993), must be applied retroactively to the instant case. *See Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 140–41 (2d Cir.1993). In *Hicks,* the Supreme Court held that a fact finder's rejection of an employer's asserted reason for its actions does not entitle a plaintiff to judgment as a matter of law because the plaintiff at all times retains the ultimate burden of persuasion. [—— U.S. at ——] 113 S.Ct. at 2747. Thus, once the 'defendant has succeeded in carrying its burden or production, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant.' *Id.* [—— U.S. at ——, 113 S.Ct.] at 2749. The ultimate question is 'whether plaintiff has proven' that the defendant intentionally discriminated [or retaliated] against [her]" because, as in the instant case, she engaged in a protected activity. *Id.* (*quoting Burdine,* 450 U.S. at 253 [101 S.Ct. at 1093])." (*Cosgrove,* 9 F.3d at pp. 1038–1039).

Having outlined the appropriate framework for the trial of plaintiff's Title VII claim, the following constitute the Court's review of the evidence, findings of fact and conclusions of law (*see* Fed.R.Civ.P. 52[a]).

## ADDITIONAL FINDINGS OF FACT

### The Plaintiff's Prima Facie Case

■ The plaintiff Jeanette Rosa established, by a preponderance of the credible evidence, that (1) she belonged to a minority, namely, a female of Hispanic descent; (2) that she applied for and was qualified for the position of senior collection representative; (3) despite her being qualified she was not promoted to the position of senior collection representative; and (4) other persons of similar qualifications were so promoted.

As a result, the burden of going forward shifted to National Westminster Bank, the plaintiff's employer, to articulate a legitimate, non-discriminatory reason or reasons for its failure to promote the plaintiff to senior collection representative.

### The Non–Discriminatory Reasons for the Failure to Promote the Plaintiff

■ By witnesses and unrefuted documentary evidence, the defendant Bank has established a number of valid non-discriminatory reasons for the failure to promote the plaintiff. These non-discriminatory reasons were substantiated by the testimony of the plaintiff herself.

The non-discriminatory reasons are as follows:

1. The persistent tardiness of the plaintiff extending from the early part of her employment as a collection representative trainee in 1983, steadily becoming worse throughout the years to 1988. The evidence of chronic lack of punctuality was uncontradicted. The tardiness is established by the documentary evidence detailed above. (See, for example, Plf's Exhs. 2, 4, 8, 9, 13, 16, 19, 22, 23 and 24).

The Court recognizes the obvious fact that punctuality and regular attendance are cornerstone qualities in most employment relationships. Being a qualified senior collection representative for the National Westminster Bank required no less punctuality and the expectation of regular attendance.

2. The persistent attendance problem, also unrefuted, and established by the documentary evidence.

3. The plaintiff's failure to cooperate and her poor attitude. The proof reveals that Ms. Rosa was not a team player. Here is one example:

"Q No. Did he tell you at that time that in his view you weren't providing him with help?

A Yes.

THE COURT: Who is this you were talking to at the time?

THE WITNESS: Ed Lewando.

THE COURT: And when was that?

THE WITNESS: October of 1986.

Q And in response to his statement by you that you hadn't been helping him, did you say anything?

A I said to him what did you want me to do? Take the work off your desk.

Q Well, did there come a time in 1987, after this performance, discussion, and the discussion about the promotion, that he did ask you to provide him specifically with help?

A Yes.

Q And was that incident one where he asked you to attend a 180–day account charge off meeting?

A Yes.

Q And did you give him the help he asked for at that time?

A No." (Tr. at p. 214).

4. The plaintiff's failure to assume responsibility. Involved in this negative trait was refusal to follow valid orders. (See, for example, testimony at pp. 135–136).

Also, in the notes of Jack Chieffo dated May 1986 (Dft's Exh. G), after complimenting Ms. Rosa for "another great month," he stated: "The only problem with Jeanette that I can see is that she does not offer any assist (sic) to me—really not looking for additional responsibilities."

5. The plaintiff's side personal business. In this regard the Court notes that she refused to desist from this detracting activity notwithstanding a direct order to do so. (See Tr. pp. 275–276).

6. The plaintiff's frequent and sometimes lengthy personal telephone calls.

## FURTHER FINDINGS OF FACT

1. The record does not support the plaintiff's contention that she was discriminated against in the Credit Collection Department of the Bank because she is an Hispanic female.

2. The Court finds that her supervisors Hay and Chieffo did not in any way discriminate against the plaintiff as a female or by reason of her Hispanic descent. On the contrary, the Court finds that the plaintiff's problem vis-a-vis promotion, was due to her own tardiness, poor attendance record and her inability to follow the rules and the other nondiscriminatory reasons set forth above.

3. The Court finds that the plaintiff's chronic tardiness, attendance problems and side business preceded the plaintiff's October 15, 1986 memorandum and her complaint to the Human Rights Commission. Thus, the Court finds no evidence that her failure to be promoted was as a result of retaliatory measures.

4. In sum, the Court finds that both the direct and circumstantial evidence fails to establish a discriminatory or retaliatory motive or intent on the part of the defendant. (*See Woodbury v. New York City Transit Authority*, 832 F.2d 764, 768 [2d Cir.1987]

["A finding of discriminatory intent is a factual determination"] ).

## CONCLUSIONS OF LAW

1. The Court finds that the plaintiff Jeanette Rosa has established a *prima facie* case of sex and national origin discrimination. (*See Montana v. First Federal Savings & Loan of Rochester*, 869 F.2d 100, 106 [2d Cir.1989] [emphasis supplied] ["To establish a prima facie case of sex discrimination under Title VII, plaintiff was required to show that she was treated less favorably than comparable male employees in circumstances from which a gender-based motive *could* be inferred"]; *Sweeney v. Research Foundation of the State University of New York, supra,* 711 F.2d at p. 1184 ["the complainant's initial burden of establishing a prima facie case is not onerous, and reviewing courts should not be preoccupied with whether a prima facie case has been established"] ).

2. The Court finds that the defendant Bank articulated clear and convincing evidence of a number of valid, legitimate, non-discriminatory reasons for failing to promote the plaintiff to the position of senior collection representation. Accordingly, the Court finds that the defendant has satisfied its burden of producing specific, objective, competent evidence (*see Sweeney, supra,* 711 F.2d at p. 1185) that its failure to promote the plaintiff was not based on sex or national origin but was based on the plaintiff's poor punctuality and attendance, her lack of cooperation, her side business and the other reasons outlined above. The Court finds that these failures in basic job requirements was a legitimate and non-discriminatory basis for the defendant's failure to promote the plaintiff.

3. The Court finds that the plaintiff failed to establish that the defendant's stated reasons for failing to promote her were pretextual. (*Cf. Zahorik v. Cornell University, supra,* 729 F.2d at pp. 94–95 [Court affirmed defendant's motion for summary judgment dismissing four female professors' Title VII claims alleging failure to award tenure, and held that there was no evidence that the decisions were based on gender]; *Louis v. Board of Education of the City of New York,* 705 F.Supp. 751, 759–60 [E.D.N.Y.1989] [in Title VII action brought by an African–American male school principal who alleged that he was denied tenure because of his race, court found that there was no evidence that parents' and teachers' complaints about the plaintiff were not genuine or were baseless]; *see also Chang v. University of Rhode Island,* 606 F.Supp. 1161, 1253 [D.RI.1985] [applying *Zahorik* to failure to promote claim] ).

4. The Court finds that the plaintiff failed to establish that she was denied promotion to senior collection representative as a result of discrimination against her by reason of the fact that she is a female minority of Hispanic descent.

5. The Court finds that the plaintiff failed to establish that she was denied promotion because of retaliatory motives.

## CONCLUSION

Accordingly, for the reasons stated, the Court directs the entry of a judgment in favor of the defendant dismissing the complaint.

SO ORDERED.