**Avi ABRAMOWITZ, Plaintiff,**

v.

**INTA–BORO ACRES INC. and Jacob Mizrahi, Defendants.**

**No. 98–CV–4139(ILG).**

United States District Court, E.D. New York.

Sept. 15, 1999.

Robert W. Ottinger, Joseph Turco, Dienst & Serrins, LLP, New York City, for plaintiff.

Kenneth R. Tuch, Pike & Pike, P.C., Bellmore, New York City, for defendants.

*MEMORANDUM and ORDER*

GLASSER, District Judge.

Plaintiff Avi Abramowitz brings this employment discrimination·action against defendants Inta–Boro Acres, Inc. ("Inta–Boro"), and Inta–Boro's President, Jacob Mizrahi, claiming that Mizrahi illegally fired him because of his age. Plaintiff alleges violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.; the New York Human Rights Law ("NYSHRL"); New York Executive Law § 290 et seq.; and the Administrative Code of the City of New York § 8–101 et seq. ("NYCHRL"). Defendants now move for summary judgment. For the reasons that follow, defendants' motion is denied.

## FACTS

Plaintiff was employed by Inta–Boro for some 25 years, beginning in 1973 until his termination on March 20, 1998. (Def. Rule 56.1 Statement at ¶ 3, 18.) Inta–Boro provides dispatched car service, primarily to corporate accounts, to and from destinations throughout New York City. (*Id.* at ¶¶ 3–4.) Inta–Boro is owned by its approximately 300 shareholder-drivers, who contract independently for fares, and annually elect officers and directors from among their number. (*Id.* at ¶¶ 5–6.) Throughout his employ at Inta–Boro, plaintiff worked as a dispatcher, with responsibility for monitoring the system by which clients were linked to available cars, addressing problems as they arose, and directing cars into zones where fares were waiting (a practice termed "chasing" in the argot of the trade). (Mizrahi Aff. at ¶¶ 12,

14 at n. 4.) At the time of his firing, plaintiff was 63 years old. (*Id.* at ¶ 12.) [1]

It is not disputed that on March 19, 1998, at around 9:30 a.m., plaintiff had a confrontation over the telephone with Lloyd Flaxman, a driver-shareholder, and also one of the elected directors, of Inta–Boro. (*Id.* at ¶¶ 21–26; Dfs.Exh. E, Abramowitz Dep. at 72–73, 84–88.) The confrontation, which defendant Mizrahi witnessed from his standpoint in the dispatch room with plaintiff, was precipitated by a communication from Flaxman instructing plaintiff to "chase" cars out of a downtown zone where Flaxman perceived they were too concentrated, into zones uptown where clients were waiting for cars. (Mizrahi Aff. at ¶ 23 and n. 7; Dfs.Exh. E, Abramowitz Dep. at 72.) [2] It is not disputed that Flaxman, acting in his capacity as an Inta–Boro director, had authority to give plaintiff this instruction. (Mizrahi Aff. at ¶ 23 n. 7; Dfs.Exh. E, Abramowitz Dep. at 129.)

Because most of the telephone lines into the Inta–Boro dispatch room are connected to recording devices, the conversation between plaintiff and Flaxman was preserved on tape. (Dfs. Exhs. L (tape), D (transcript thereof).) The full text of the transcribed conversation follows:

Plaintiff: Yeah.

Flaxman: Yeah, I want to ask you a question on the phone.

Plaintiff: (inaudible)

Flaxman: Why I don't chase myself, is that what you wanna know?

Plaintiff: Yeah.

Flaxman: I, let me tell you something I've—

Plaintiff: No, no don't, just, just tell me what you want to say.

Flaxman: Let me tell you something, I'm out here seven hours, I'm out here three hours with you, I already did four jobs already.

Plaintiff. That's wonderful.

Flaxman: I, I chase my own—

Plaintiff: That's wonderful—

Flaxman: Okay.

Plaintiff: Yeah.

Flaxman: So what are you, what are you, what are you breaking my—

Plaintiff: What are you looking to break my balls for—

Flaxman: (inaudible)

Plaintiff: You're giving me a fucking message that don't make sense. Who the fuck you think you are?

Flaxman: Did you read the copy—

Plaintiff: Yeah, I read the copy—

Flaxman: What is the, what is the, what is the bottom—

Plaintiff: I don't understand the copy I would have answered the copy.

Flaxman: What does the bottom of the copy say?

Plaintiff: I knocked it off already, I just re-got it, I, I couldn't understand that's why I asked you to explain.

Flaxman: I don't understand—

Plaintiff: Stop playing with my fucking head kid.

Flaxman: So I want to ask you—

Plaintiff: Either you dump me—either you tell me to get the fuck out of here, but you don't play with my fucking head.

Flaxman: Not, never.

Plaintiff: You don't play with my fucking head sonny.

Flaxman: Never.

---

1. Defendants do not dispute that plaintiff was a "competent and able" dispatcher, and a "loyal employee for many years." (*Id.* at ¶¶ 17–18.)

2. At the time, Flaxman was driving, and also monitoring other Inta–Boro cars by means of a mobile data terminal. Flaxman communicated the initial instruction to plaintiff over a computer link to the dispatcher's room. Plaintiff responded with a request that Flaxman call him directly, whereupon the telephone confrontation ensued. (Mizrahi Aff. at ¶¶ 23–25; Abramowitz Dep. at 85.)

Plaintiff: Because you're getting on my fucking nerves and don't make me drop the last straw.

Flaxman: (inaudible).

Plaintiff: Just remember what I'm telling you. You want to tell me on authority I'll do anything you guys need—

Flaxman: (inaudible).

Plaintiff: I'll help anybody, but don't you break my fucking balls.

Flaxman: Goodbye.

Plaintiff: Goodbye.

(Tuch Affirmation, Exh. D.)

The next day, having reviewed the computer transmission from Flaxman, and the recording of the conversation reproduced above, Mizrahi fired plaintiff. (Mizrahi Aff. at ¶¶ 27–32.) There are conflicting accounts of the reasons offered to plaintiff for his termination. Mizrahi asserts that he terminated plaintiff for yelling obscenities in the dispatch room, and for what he perceived as plaintiff's threat to Flaxman. (Mizrahi Aff. at ¶ 32.) Plaintiff states that at the time of his firing he was offered no account of why, but that on March 23, 1998, he returned to the office to make inquiries concerning the extension of his health insurance benefits, and that at that time Mizrahi told him that he "did not fit in with [Mizrahi's] long-term plans." (Dfs.Exh. E, Abramowitz Dep. at 122.) For his part, Mizrahi denies having made that statement. (Mizrahi Reply Aff. at ¶ 29.)

Plaintiff avers that over the course of his 25 years at Inta–Boro he and other dispatchers at Inta–Boro had frequent occasion to yell and curse at drivers, for the purpose, he says, of eliciting cooperation from them. (Dfs.Exh. E, Abramowitz Dep. at 65–71.) There is ample additional evidence in the record showing that for most of plaintiff's tenure at Inta–Boro oc-

casional yelling and cursing by dispatchers was tolerated, if not encouraged, and that generally in the "black car" industry[3] it is not uncommon for dispatchers to raise their voices and use coarse language in speaking to drivers. (Pl.Exh. E, Ippolito Dep. at 19–23, 47; Pl.Exh. F, Grasso Dep. at 7–8; Pl.Exh. J, Hodge Decl. at ¶¶ 2–4; Pl.Exh. A, Mizrahi Dep. at 44; Mizrahi Aff. at 35.)

The record presents conflicting evidence concerning whether and to what extent plaintiff was warned against outbursts and vulgar language directed to drivers. Mizrahi states that although his predecessor as President of Inta–Boro, Theodore Ippolito,[4] tolerated and himself often exhibited such conduct, Mizrahi attempted to establish a new policy. (Mizrahi Aff. at ¶¶ 35–36.) To that end, he states, upon assuming his duties in January of 1998 he specifically told plaintiff, among others, to "tone down his conduct." (Id. at 20, 37; Pl.Exh. A, Mizrahi Dep. at 18.) For his part, plaintiff's statements are contradictory. At a hearing before an Administrative Law Judge in a New York State Department of Labor proceeding to determine plaintiff's eligibility for unemployment insurance, plaintiff admitted that "maybe once" Mizrahi had told him to "calm it down, tone it down," in reference to the use of a raised voice and screaming in the dispatch room. (Dfs.Exh. G, Abramowitz Testimony at 60.) In his deposition in this action, however, plaintiff denied having been told by Mizrahi to "tone it down," at any time prior to his confrontation with Flaxman on March 19, 1998. (Dfs.Exh. E, Abramowitz Dep. at 73.)

Plaintiff states that immediately upon being fired, he was replaced by Dawn Villano, a 26–year–old Inta–Boro dispatcher, who, plaintiff claims, was being "primed" for his position. (Id. at 76, 105.) Defen-

---

3. The term refers to the car typically preferred in the dispatched car industry, namely the black sedan, usually a Lincoln Town Car. (Dfs.' Mem. of Law at 1.)

4. Ippolito was President of Inta–Boro for more than 20 years before Mizrahi's election in 1997. (Defs.' Mem. of Law at 2.)

dants respond that no one was hired to replace plaintiff upon his departure, and that Villano simply assumed duties that she was already charged with during the 6–8 weeks each year when plaintiff was absent from Inta–Boro, taking paid or unpaid vacation. (Mizrahi Aff. at ¶¶ 49–52; Mizrahi Reply Aff. at ¶ 31.)

There is sharply conflicting testimony concerning whether defendant Mizrahi harbored discriminatory animus toward older employees at Inta–Boro. Mizrahi denies such sentiments, and denies ever having made statements expressing such animus. (Mizrahi Aff. at ¶ 41; Mizrahi Reply Aff. at ¶ 15.) Plaintiff's allegations to the contrary are supported by a Declaration of Robert Hodge, a former Inta–Boro employee discharged in late 1997 for falsifying time cards. Hodge states that on several occasions in 1997 (prior to Mizrahi's tenure as President of Inta–Boro), Hodge witnessed or was privy to derogatory statements by Mizrahi aimed at Inta–Boro's older employees. Among these statements, Hodge cites comments by Mizrahi concerning plaintiff that he was "from another era," and "not of this century." (Hodge Decl. at ¶ 5.) Hodge also alleges that Mizrahi referred to Hodge's fellow shift workers, who included several older women, as "old hags," made mocking comments about a 58–year–old female employee, and once confided in Hodge that if he could, he would fire Hodge's entire shift (consisting mostly of older women) and make Hodge supervisor. (Id. at ¶¶ 3, 7–9.)

## DISCUSSION

### I. The Standard for Summary Judgment

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate "if the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986). The movant has the burden "to demonstrate that no genuine issue respecting any material fact exists." Gallo v. Prudential Residential Services, 22 F.3d 1219, 1223 (2d Cir.1994). This burden may be met by showing that "little or no evidence may be found in support of the nonmoving party's case," but in considering the weight of such evidence, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." Id.

### II. Proving Age Discrimination Under the ADEA, the NYSHRL, and NYCHRL

The ADEA prohibits employers from discriminating against workers aged 40 or older on the basis of their age. 29 U.S.C. § 623(a). Actions brought under the ADEA apply the burden-shifting analysis originally set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) with respect to Title VII discriminatory-treatment cases. As applied by the Second Circuit in the age-discrimination context, the first step of this analysis is to ascertain whether the plaintiff has established a prima facie case of discrimination. Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 508 (2d Cir.1994). This entails a four-fold showing:

> [T]o establish a prima facie case of termination of employment in violation of the ADEA, a plaintiff must show (1) that he was within the protected group, (2) that he was qualified for the job, (3) that he was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of age discrimination.

Stetson v. NYNEX Service Co., 995 F.2d 355, 359 (2d Cir.1993). If the plaintiff does establish a prima facie case, the burden of proof "shifts to the defendant to articulate a 'clear and reasonably specific,' non-discriminatory business rationale for the em-

ployment action." *Robinson,* 21 F.3d at 508 (quoting *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991)). The burden shifts once more if defendant makes out such a rationale, returning to the plaintiff, who "must then raise a material issue of fact as to whether the asserted nondiscriminatory reason is mere pretext for illegal age discrimination." *Id.*

■ Courts apply the same burden-shifting analysis to cases brought under the NYSHRL and under the NYCHRL. *See Song v. Ives Lab., Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992) (finding the analysis analogous as to discrimination actions brought under the NYSHRL); *Gerzog v. London Fog Corp.,* 907 F.Supp. 590, 597 (E.D.N.Y.1995) (finding the same as to actions under the NYCHRL).[5]

III. *Analysis of Plaintiff's ADEA Claim*

A. *Plaintiff's Prima Facie Case*

■ Defendants argue that plaintiff has failed to raise an issue of fact as to whether his discharge occurred under circumstances giving rise to an inference of age discrimination. Specifically, defendants contend that plaintiff failed to demonstrate that he was replaced by a younger worker. (Defs.' Mem. of Law at 6–13.)

■ The burden of proof for a plaintiff's *prima facie* case of employment discrimination is not onerous. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995). Nevertheless, a *prima facie* case must exhibit "at least a logical connection between each element of the *prima facie* case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption.'" *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 311–12,

116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). In determining whether the plaintiff has "met the initial burden of showing 'circumstances giving rise to an inference of discrimination,' the function of the court on a summary judgment motion is to determine whether the 'proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'" *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 204 (2d Cir.1995) (quoting *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 38 (2d Cir. 1994)).

The essence of plaintiff's showing of discrimination on the basis of age is that defendants replaced him with a 26–year-old for conduct that, although seemingly insubordinate and rude, was in fact commonplace according to the customs of the dispatch-room where he had worked for 25 years. With the evidence taken in the light most favorable to plaintiff as the party opposing summary judgment, this contention finds ample support in the numerous exhibits attesting to the fact that "vulgar language" was practically a *lingua franca* among drivers and their dispatchers, both at Inta–Boro and throughout the "black car" industry. (Pl.Exh. A, Mizrahi Dep. at 44; Pl.Exh. E, Ippolito Dep. at 19–23; Pl.Exh. F, Grasso Dep. at 7–8.) Taken together with the undisputed fact that plaintiff's responsibilities were re-assigned to a 26–year–old dispatcher, the documentary evidence adduced permits the inference that plaintiff was discharged because of his age.[6] *See O'Connor,* 517 U.S. at 313, 116 S.Ct. 1307 (observing that

---

5. Although defendants here move for summary judgment upon plaintiff's claims under the NYSHRL and NYCHRL, they fail to brief that motion, focusing solely upon the ADEA claim. Inasmuch as a motion for summary judgment on the state claims must fail for the same reasons that the motion on the federal claim fails, which reasons are set forth in what follows, that failure is of no consequence in this instance. Hereafter, the Court

will address only the ADEA claim, and arguments raised with respect to it.

6. Defendants cite several "work force reduction" cases in support of their contention that plaintiff fails to make out a *prima facie* case that he was "replaced" by a younger worker. (Dfs. Mem. of Law at 7–8.) Those cases are inapposite, inasmuch as there is no evidence in the record that business considerations had

"the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact the plaintiff was replaced by someone outside the protected class").

Defendants concede that plaintiff was qualified to perform his duties, that he falls within the class protected under the ADEA, and that he was discharged. Accordingly, plaintiff has met his *prima facie* case.

## B. *Nondiscriminatory Reason*

■ Once a plaintiff demonstrates a *prima facie* case of age discrimination, "the defendant is obligated to produce evidence 'which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Gallo,* 22 F.3d at 1226 (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (emphasis in original). Defendants have presented a recording of plaintiff's telephone confrontation with Flaxman, and transcripts of that recording, together with uncontested averments indicating that Flaxman had authority to give instructions to plaintiff. This evidence is enough to rebut the presumption of age discrimination that plaintiff's *prima facie* case established.

## C. *Pretext for Age Discrimination*

■ Since the defendants have shown nondiscriminatory reasons for plaintiff's firing, the burden of proof shifts back to plaintiff to demonstrate that the prof-

fered nondiscriminatory reasons are in fact a pretext for age discrimination. *Gallo,* 22 F.3d at 1226. "This may be demonstrated by reliance on the evidence that established [the] *prima facie* case, without any additional evidence being required ..., or by presentation of additional evidence...." *Id.* (citations omitted). Furthermore, the "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Cronin,* 46 F.3d at 203.

Plaintiff's case that defendants' stated nondiscriminatory reasons for firing him rests for the most part on the same evidence already cited in favor of his *prima facie* case. Plaintiff submits that, notwithstanding the unfavorable impression his outburst is likely to make on outsiders unfamiliar with the rough give-and-take of the dispatch room, there was nothing particularly unusual about his exchange with Flaxman on March 19, 1998, when seen in the light of his reputation and customary manner, as established over the course of 25 years as a dispatcher for Inta–Boro. In support of this proposition plaintiff advances the testimony cited above confirming that he and other dispatchers at Inta–Boro and in the industry habitually used "vulgar language" in communicating with their drivers.[7]

There is other evidence supporting plaintiff's argument that his firing was pretextual. Mizrahi asserts that, on two

---

anything to do with plaintiff's discharge. *See Barnes v. GenCorp Inc.,* 896 F.2d 1457, 1465 ("A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge.").

7. It is true that Flaxman was both a driver and an Inta–Boro director, with conceded authority to give instructions to plaintiff, like the one that precipitated the March 19 confrontation. (Mizrahi Aff. at ¶ 23 n. 7.) But

plaintiff has also offered evidence tending to show that it was not plaintiff's custom to discriminate among drivers according to their director-status, and that this was understood by dispatchers and drivers alike. (Dfs.Exh. E, Abramowitz Dep. at 65–72, 88.) Moreover plaintiff asserts, and defendants do not deny, that he actually complied with Flaxman's directive, despite his intemperate protest against it. (*Id.* at 130.) Plaintiff also testifies that he had a longstanding relationship with Flaxman, in the context of which their confrontation amounted to just another instance of "breaking my shoes." (*Id.* at 78, 88, 127–

occasions after becoming President of Inta–Boro in January of 1998, he informed plaintiff that he did not approve of "yelling and screaming in the dispatch room," but plaintiff recalls at most only one instance of a mild admonition to "tone down" his conduct. (Mizrahi Aff. at ¶ 20); (Dfs.Exh. G, Abramowitz Testimony at 60.) Thus, there is a factual issue raised about the extent to which plaintiff's habitual conduct was no longer to be tolerated under Mizrahi's new leadership.[8] Plaintiff's testimony that Mizrahi informed him, on the Monday after his firing, that he had been let go because he did not "fit in with [Mizrahi's] long-term plans," tends to show that Mizrahi had a motive in releasing plaintiff different from the one proffered in his defense. (Dfs.Exh. E, Abramowitz Dep. at 122.) Taken in the context of the Hodge Declaration allegations tending to show that Mizrahi harbored discriminatory animus toward his older employees, and that he specifically regarded plaintiff as "not of this century," plaintiff's testimony concerning the Monday statement succeeds in raising an issue of fact as to whether the firing was pretextual.[9]

The Court is mindful of the Seventh Circuit's apt cautionary observation that a federal court does "not sit as a super-personnel department that reexamines an entity's business decisions." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986). The inquiry here is, and must be, limited to whether a question of fact is raised concerning defendants' stated reasons for discharging plaintiff. The evidence concerning plaintiff's habits of speech and manner over 25 years as a dispatcher, defendants' efforts to apprise

him of a change of policy regarding those habits, and defendant Mizrahi's alleged discriminatory animus toward his older employees, including plaintiff, raise several such issues of fact, which may not be resolved at this juncture as a matter of law. Accordingly, defendants' motion for summary judgment must be denied.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is denied.

SO ORDERED.

---

30.) It is worth noting, for these purposes, the conclusion Judge Joseph Wolfermann, Administrative Law Judge of New York State Unemployment Insurance Appeal Board, that "while claimant's speech may have constituted an instance of bad judgment it was not sufficient to be misconduct such as would disqualify the claimant from receiving unemployment insurance benefits." (Pl.Exh.H.)

**8.** Mizrahi also concedes that he never warned plaintiff that outbursts and vulgarity ad-

dressed to drivers could result in termination. (Mizrahi Aff. at ¶ 38.) This too tends to support plaintiff's contention that the reasons proffered for his discharge were pretextual.

**9.** Defendants insist that Hodge's credibility is "suspect," but of course, this is exemplary of the kind of issue that cannot be resolved as a matter of law. *Rosen v. Thornburgh*, 928 F.2d 528, 534 (2d Cir.1991).